[No. 24836.  *En Banc.*  October 30, 1934.]

ANNA McKINNIE, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.[1]

*The Attorney General* and *Browder Brown, Assistant (V. D. Bradeson,* of counsel), for appellant.

*John F. McCarthy,* for respondent.

*Kenneth Durham, amicus curiae.*

[1]Reported in 37 P. (2d) 218.

246

MITCHELL, J.—Anna McKinnie, widow of W. B. McKinnie, filed a claim with the department of labor and industries for compensation under the workmen's compensation act, alleging that her husband died as the result of an accidental injury received in extrahazardous employment. The claim was rejected by the department upon its finding and conclusion that the death was not the result of an injury, as contemplated by the act. Being dissatisfied, the widow appealed to the joint board of the department of labor and industries for a rehearing, which was granted. Testimony of a number of witnesses on behalf of the claimant was taken before an examiner for the department, and reported to the joint board. The department offered no witness. Upon the files already in the case, together with the testimony on behalf of the claimant, the joint board sustained the finding and decision of the supervisor in rejecting the claim.

The widow appealed to the superior court, and upon a hearing, upon the record taken up from the department, the court found that, on and prior to October 30, 1931, deceased was employed in an extrahazardous occupation by the port of Longview, and was required to, and did, assist in tying up vessels at the dock; that, on the 21st day of October, 1931, while thus engaged, upon pulling one of the mooring lines of the steamship Los ANGELES, being moored at the dock, he was required to, and did, exert a tremendous and extraordinary effort in pulling on the line. Further, that, at that time, the deceased was diseased (having what we may here speak of as a hardening of the arteries); and that, as a direct and immediate result of the extraordinary effort exerted by the deceased on October 21, 1931, a mesenteric thrombosis was caused or produced, which resulted in death on October 30, 1931. Conclusions of law accordingly were entered upon the

findings. The department has appealed from a judgment in favor of the widow, upon the findings and conclusions.

A preliminary question, or first assignment of error, relates to a matter of proof. Decedent's injury occurred on October 21st, and he died nine days later. There was abundant evidence that, after he was hurt, he did not look or act as well as before, his loss of appetite increased, his complaints were frequent, and finally, for considerable time before his death, he suffered from severe vomiting. The widow testified before the examiner that, on October 27th, six days after Mr. McKinnie was hurt, he told her that, as he was pulling on a rope a few days before, it seemed as though "something had come right up into his mouth." Of the same sort, the family physician testified before the examiner that, while attending Mr. McKinnie in his last sickness, Mr. McKinnie told him that, while lifting and pulling the cable or rope, he felt something break inside of him, that he felt compelled to sit down, and had not felt well since. This testimony on the part of the widow and the physician was objected to by the department as hearsay.

The testimony, technically speaking, may not have been admissible under the strict rules observed in court proceedings, but under Rem. Rev. Stat., § 7697 [P. C. § 3488], found in the workmen's compensation act, hearings upon appeals to the superior court are de novo, and informal and summary. Under the statute and practice, all proceedings before the department, prior to a hearing before the joint board, are informal, and uniformly include unsworn reports of investigators and physicians, which consist more or less of hearsay with respect to the case, much of it gathered from members of the injured person's family or friends and associates, all of which reports are, by

statute, made a part of the record and required to be filed as such and transmitted to court upon appeal.

The manner in which such statements get into the record may affect the weight to be given to them, but, in our opinion, they are not incompetent or inadmissible, and may be considered for what they are worth. Significantly, in the present case, an assistant supervisor, upon making an investigation of this claim soon after the claim was filed, made a written report in the case, showing essentially the same statements as having been reported to him by the widow and the physician. This report was, under the statute, made a part of the case, upon which it should be determined, both in the department and in any appeal to the courts. This assignment of error is, in our opinion, without merit.

The other assignments of error, as argued, are as follows: (1) That the deceased did not sustain an accident within the meaning of the workmen's compensation act; and (2) that, if he did sustain such an accident, death was due to a pre-existing disease, and not to the accident.

The two questions are so closely related that they may be considered together, in our opinion.

The accident happened on Wednesday, October 21, 1931. Harvey Hart, who was an employee of the port of Longview, worked with Mr. McKinnie in mooring the Los Angeles to the dock. He testified as follows:

"Q. Just state what was done there at that time, Mr. Hart? A. There were four men used in mooring the ship, two to take the head lines, two to take the stern lines. It was customary for Mr. McKinnie and myself to take the stern lines when the ship comes alongside as previously stated. The heaving lines were thrown ashore and being a large ship, naturally she used large hawsers. To the best of my knowledge that type of ship uses a Manila line approximately four

inches in diameter and steel hawsers of about an inch in diameter. When it approaches the side, a line is thrown which we take and then a large line is fixed on, and it is drawn back from one hundred to a hundred and fifty feet from the ship and made fast to your cavel; next, after that, you take the spring line which is a stern line and draw it forward from midship from sixty to seventy-five feet and the same process is repeated. On German ships they, not knowing the mooring conditions of the Columbia river, usually insist on five or six lines made fast on each end of the ship. Q. Will you state whether that work of pulling on these lines is hard work? A. The work is very, very strenuous, it must be done fast and from my own personal experience, you sometimes pull to the utmost of your strength. At times you can't do anything with the line until more people are brought to help you. It's very strenuous. Q. Do you recall that particular occasion the amount of effort expended by yourself and Mr. McKinnie? A. As I remember, it was an average ship that required all our ability to pull. It was negotiated successfully but it was—well, I would say this: I could say it was a hard pull; it was an exhausting pull, I will say that. When you are through, you are absolutely tired out.''

The widow, in addition to testimony already referred to in the first assignment of error, upon speaking of the decedent's being sick the week before he died and of his complaints to her, first on Friday, October 23rd, testified:

''A. Well, I asked him what was the matter and he said 'oh, I don't know' he said. He said 'my bowels is not normal' and then, well, I don't know, there is nothing else particular said, excepting that on Saturday why he didn't feel well and he wanted to lie down again. Q. What did he say at that time? A. Well, he said he wasn't feeling well, and wanted to lie down, and wanted to take a rest before he went back on duty. Q. To go back to Friday, did he go then and lie down? A. He did. Q. And was that usual for him to do that? A. No, not unless he was disturbed of his rest in the

250

mornings; happened to get up for something. Q. Will you state whether or not that was the first time that he had acted in that way for a considerable period of time? A. Yes, it was. Q. Then on Saturday the same thing occurred, you say? A. Yes. Q. Did he lie down then? A. Yes, he did. Q. Then after Saturday, what happened, if anything, during that week? A. Well, there was nothing except on Sunday he laid down too, in the afternoon before he went to work. Q. Now, did he work all that week? A. No, on Tuesday we went to Portland. Q. What, if anything, happened in Portland? A. Well, he wasn't well and we went and had our eyes fitted and we went to a show. Q. Well, what, if anything happened while you went to the show? A. Well, there wasn't anything only he didn't seem to take any interest in it. Q. Now how long did you stay in Portland? A. Came back the 28th. Q. What did you do while you were there aside from going to the show and having your eyes examined? A. Well, we went out Tuesday evening, we went out to the stock show. Q. Was there anything happened while you were there that would indicate he was unwell? A. Yes, he didn't stay until it was out. He didn't feel well and we didn't stay until it was through. . . . A. The last day he worked was the night of the 29th, I guess. Q. What time did he get home? A. Well, he got home between twelve and one. Q. In the morning? A. Yes. Q. Then what happened when he came home on the last time? A. Well, when he came home why he was sick and went to throwing up. Q. Did he complain of any pain at that time? A. He had pain in his stomach he said. Q. And did you call the doctor? A. Yes. Q. What doctor? A. Dr. Hackett. Q. That is Dr. E. C. Hackett? A. Yes. Q. And he came and treated Mr. McKinnie? A. Yes. Q. Now Mrs. McKinnie aside from what Mr. McKinnie told you during those several days was there anything else you noticed that would indicate to you that he was not in his normal condition? A. Well only he was sick and he didn't seem to have any energy or anything. He kept his bed a good deal of the time and he could get up to his meals and then he would lie down again. Q. And was there anything else that would indicate to

you that he wasn't normal—his usual self? A. No, I don't know as there was. Q. How was his appetite did he eat? A. He didn't have a good appetite, no, his appetite wasn't very good. Q. You mean that he never had a good appetite? A. No he didn't. Q. Was that usual? A. No, he was always a hearty eater. Q. Did he take a lunch with him the night he went to work? A. Yes. Q. And during that period there from October 21st until his death did you notice anything in respect to whether or not he had eaten his lunch? A. There was one time he brought part of his lunch back and the night he was taken sick, he brought part of his lunch back. He didn't eat it all. Q. Then there were two times that he brought part of his lunch back? A. I think twice he brought it back. Q. When was the first time? A. Well, I think it was the 22nd; the night of the 22nd I think it was. Q. That he didn't eat all of his lunch? A. Yes. Q. Was that usual? A. No, Mr. McKinnie was always a good eater and seemed to relish his food. Q. And during that period for the remainder of the time, how was his appetite? A. No, he didn't eat good. Q. Was that usual? A. No, it wasn't. Q. Had you noticed that failure of appetite prior to the 21st of October? A. No, I never noticed anything wrong with his appetite.''

Doctor Earl C. Hackett, the family physician, who was familiar with Mr. McKinnie, who knew the history of the accident and the history of Mr. McKinnie's existing disease (hardening of the arteries), who, of course, was acquainted with his suffering after the injury until his death, and who was present at an autopsy upon the body of the decedent, the report of which witness had examined and was familiar with, in addition to testifying as already mentioned in the first assignment of error, testified that, in his opinion, death was due to mesenteric thrombosis, which, in turn, was caused by the strain suffered by the decedent on October 21st; and that the fact that the decedent worked after the injury from day to day, made a trip to Port-

land, visited a livestock show without disabling symptoms, until eight days after the injury, was not inconsistent with his opinion as to the cause of the death.

The doctor frankly declined to say that he was positive that death was due to mesenteric thrombosis, but said that his opinion was based on the clinical findings, personal knowledge of the decedent, and the history of the case with which he was conversant. We may say that this frankness, under all of the facts and circumstances, and considered in connection with all of the testimony on the part of the doctor, gives added weight and credence to his opinion. He further testified as follows:

"Q. Is your opinion based on what you know as to the cause of his death from your observation and findings? A. From my observations, and our experience. Q. Is that a reasonable opinion? A. Well, we think it is usually reasonable. Q. Well, doctor, is there sufficient evidence there for you to form a reasonably certain opinion as to the cause of Mr. McKinnie's death? A. Well, as near as one can, I think so. There was a question at the time he died and I called in two or three doctors. There were several that saw the man before he died, and we attended the autopsy in a bunch, three or four of us, and all felt satisfied it was a mesenteric thrombosis caused his death."

Doctor T. Homer Coffen, upon being made conversant with the facts connected with the injury, the subsequent suffering and death of the deceased, having seen the written report of the autopsy and having treated Mr. McKinnie for hardening of the arteries from 1929, testified that he saw him periodically, and sometimes frequently during that time, until January, 1931, the last time that he saw him professionally, and at which time, though still suffering from hardening of the arteries, "his condition was satisfactory."

Then, after testifying in detail with reference to the facts and circumstances of the case as he knew and understood them to be, he testified as follows:

"Q. And what would you say, then, doctor, was the cause of his death? A. The thrombosis of the mesenteric arteries which were sclerotic and diseased. Q. And what, if anything, would you say, doctor, was the cause of the mesenteric thrombosis? A. I feel very sure it was due to the physical effort."

He further testified, summing up the situation as he saw it, as follows:

"Q. And, doctor, when you have facts such as your opinion has been based on here of muscular exertion, the symptoms of pain, etc., that he experienced following this muscular exertion, could you say you were speculating or conjecturing when you say his death was primarily due to muscular exertion? A. It is so obvious to me that it is definitely related to physical exertion. Q. In other words it is not a mere conjecture or guess? A. It is obvious."

This was clear and satisfactory, as much so as the opinion of an expert based on facts in evidence and personal knowledge reasonably can be.

Doctor E. W. St. Pierre, who testified that he heard the testimony of Doctor T. H. Coffen and also the testimony of Doctor C. H. Manlove, who performed the autopsy, and that he had examined the autopsy report, further testified:

"Q. And, doctor, you might just state whether or not your opinion coincides with Dr. Coffen's? A. It does."

Doctor C. H. Manlove testified that, as a physician who had specialized in pathology for eighteen years, he performed a post mortem on the body of Mr. Mc-Kinnie and made a written report of it. (This is the report referred to by all the doctors and that was

filed with the department of labor and industries.)
He testified:

"Q. Doctor, you have heard the testimony of Dr. Coffen with reference to the condition of Mr. McKinnie at the time he consulted Dr. Coffen? A. Yes, sir. Q. And you heard the questions which were propounded to Dr. Coffen in which certain facts were assumed as being shown in the record? A. Yes. Q. And doctor, taking all these things into consideration, what at this time would you say as to being the cause of the death of Mr. McKinnie? A. Well, I would answer that in this way. I would like to leave out entirely things that I heard in the other testimony and really make my own statement, and state what I feel about the case, and that is that it is a mesenteric thrombosis, regardless of what the other testimony might be. Q. I am not referring to the doctors opinions but merely to the facts showing his condition at the time? A. The point I would like to make is this: That Dr. Coffen knows a phase of medicine that I do not, and he studies that phase of medicine differently than I study that phase of medicine, and all I could say is that I would agree with Dr. Coffen. Well, there is that, but I said that I don't study that phase of medicine and when they came to me I knew nothing about this particular case. I was just called. I knew nothing outside of the fact that here was a dead man, and would I autopsy this man, and I said I would, and I did it out of the pure love of science; for nothing else than the true love of science I did that."

The post mortem report closes with what is termed an "anatomical diagnosis," in which it was stated that two probabilities were apparent as to the cause of death, the second of which was mesenteric thrombosis, with which, it seems, was considered former existing diseases of hardening of the arteries and pancreatitis. Then, upon his saying that the anatomical diagnosis was based entirely upon "facts and conditions he found," he further testified:

"Q. And since you have heard the other facts con-

cerning the exertion expended by Mr. McKinnie on October 21st, 1931, and his acts and attitude and statements after that time, what would be your opinion as to the cause of his death? A. I think the cause of death is mesenteric thrombosis.''

He then testified that he could not say why the thrombus occurred, but he was not asked for an opinion in that respect based upon the testimony or report concerning the history of the case, or as to the facts of severe muscular exertion performed by the decedent on October 21st. Upon being asked if he found any thrombus in the body, he answered that he did not, but that he was satisfied there was one ''from the findings in the mesenteric tract.''

As opposed to all this proof is the short written finding of the medical examiner of the department, dated and filed July 5, 1932, that there was no ''relationship between the alleged strain and this man's death.'' His further finding or report was:

''Note that the accident, or aggravating incident, was supposed to have occurred October 21, 1931. The man continued to work until October 29th. Now, any mysentery thrombosis that occurred would show its symptoms immediately and must have occurred on October 29th, when he was taken ill. The alleged strain of a week prior had nothing to do with the formation of the thrombosis, in my opinion.

''Reject not due to injury.''

The department's doctor, of course, was not under oath, examination or cross-examination. There is not the slightest intimation that he ever saw the deceased prior to or after the decedent's death, nor that he ever saw or talked with anyone who had seen the deceased, and certainly, he knew nothing about the full and convincing testimony of witnesses under oath in this case, because his report or apparently arbitrary finding was

given months before the trial of the case before the joint board.

The weight of all the proof, in our opinion, is clearly against the findings and conclusions of the department and its joint board. It overcomes by a clear preponderance the statutory *prima facie* correctness of the findings of the department, and at the same time, by a clear preponderance, supports and sustains the findings and conclusions of the trial court.

There is no question that the deceased was engaged in extrahazardous employment at the time he was injured, nor that the injury was a sudden and tangible happening of a traumatic nature under the statute as we have heretofore construed it, nor can there be any serious question that the injury happening on October 21st was the cause of the decedent's death.

While the distressing effects of the accidental injury involved in the case of *Cole v. Department of Labor & Industries,* 137 Wash. 538, 243 Pac. 7, appeared more quickly, to the extent of manifest danger, than in the present case, nevertheless the principle of that case is in point in this one. There, it was said:

"While there was medical testimony showing that Cole was then afflicted with heart and artery disease, though he did not seem to appreciate such affliction, the evidence fully warranted the conclusion that his then physical effort caused a rupture in the region of his heart, constituting a sudden injury. While this affliction, suddenly coming upon Cole, may have been, in a sense, at or near the culmination of his general affliction, it, nevertheless, seems clear from the testimony that what he there did, by putting forth his strength, caused the breaking or giving away of something about his heart. Our decisions in *Zappala v. Industrial Insurance Comm.,* 82 Wash. 314, 144 Pac. 54, L. R. A. 1916A 295; *Shadbolt v. Department of Labor & Industries,* 121 Wash. 409, 209 Pac. 683, and *Frandila v. Department of Labor & Industries, ante* p. 530,

243 Pac. 5, just decided by us, seem decisive against the department's contention here made. In the last cited case, the question is reviewed at length. It seems to us, that the evidence was ample to support the findings and conclusion that Cole was injured as the result of a fortuitous event while engaged in extra-hazardous employment, and that, in so far as the findings and judgment establish that fact and award attorney's fees and costs, it must be affirmed."

To the same effect is the case of *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821, wherein this court said:

"Had Mr. Metcalf's violent efforts sawing the log, in an attempt to clear the road for Mr. Benson's passage, resulted in a sprained wrist, a torn tendon or a dislocated shoulder, any one of those injuries would clearly have been

" '. . . a sudden and tangible happening of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom.'

"The fact that his arteries had so hardened that death was likely to result 'from a sudden and tangible happening of a traumatic nature,' does not deprive Mr. Metcalf's widow and minor child of their right to statutory benefits. It was not the legislature's purpose to limit the provisions of the workmen's compensation act to only such persons as approximate physical perfection."

That case was cited and the rule announced in it approved in *McArthur v. Department of Labor & Industries,* 168 Wash. 405, 12 P. (2d) 418.

The evidence and all fair inferences from it show that the workman suffered from a very severe strain in docking the boat on October 21st, and that his suffering progressively continued thereafter until his death a few days later.

We have held that a case comes within the work-

men's compensation act where it appears that the workman collapsed from severe or over-exercise, coupled with pre-existing disease, such as hardening of the arteries. *Frandila v. Department of Labor & Industries*, 137 Wash. 530, 243 Pac. 5, and cases therein cited.

Two excellent cases that may be added to the great many already to be found in our reports are the recent cases of *Falmouth Docks & Engineering Co., Ltd., v. Troloar*, English Law Reports, Appeal Cases 1933, p. 481, and *Jones & Paton, Ltd., v. James*, found in the same volume of English Law Reports, Appeal Cases, at page 501. The holding in the latter case is well expressed in the syllabus, as follows:

''An accident arises out of a workman's employment within the meaning of s. 1 of the Workmen's Compensation Act, 1925, when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of the workman's health. In each case the arbitrator adjudicating upon a claim for compensation must consider whether in substance, so far as he can judge on such a matter, the accident came from the disease alone, so that whatever the man had been doing it would probably have come all the same, or whether the employment contributed to it.''

Nor is there any merit in the suggestion of the appellant that Rem. Rev. Stat., § 7679 [P. C. § 3472], subd. (1), requiring a segregation to be made when there is a combination of pre-existing disease and an accident, is applicable. Clearly, that applies only to a claim by the injured workman himself, and not to a claim by the widow or other dependent of a deceased workman.

Judgment affirmed.

MILLARD, MAIN, HOLCOMB, BLAKE, and GERAGHTY, JJ., concur.

STEINERT, J. (dissenting)—In my opinion, claimant's evidence did not establish the fact that the death of the decedent was the result of the alleged strain, but at most presented only a conjecture, or possible inference, that death *may have been due* to such strain.

The claim in this case was fully investigated by the department of labor and industries, and after such investigation had been completed, the department found and decided that death was *not* the result of an injury as contemplated by the workmen's compensation act. With reference to such situations, Rem. Rev. Stat., § 7697 [P. C. § 3488], provides:

"In all court proceedings under or pursuant to this act the decision of the department shall be prima facie correct and the burden of proof shall be upon the party attacking the same."

Upon appeal to the superior court, the claimant assumes and must meet the burden of proving that the person alleged to have been injured sustained an injury compensable under the statute. *Marney v. Industrial Insurance Department,* 98 Wash. 483, 167 Pac. 1085; *Kavaja v. Department of Labor and Industries,* 126 Wash. 284, 218 Pac. 196; *Boyer v. Department of Labor and Industries,* 160 Wash. 557, 295 Pac. 737; *Frich v. Department of Labor and Industries,* 169 Wash. 282, 13 P. (2d) 67; *Zoff v. Department of Labor and Industries,* 174 Wash. 585, 25 P. (2d) 972; *Mecartea v. Department of Labor and Industries,* 176 Wash. 27, 28 P. (2d) 257.

The recent cases of *Cheney v. Department of Labor and Industries,* 175 Wash. 60, 26 P. (2d) 393, and *Spier v. Department of Labor and Industries,* 176 Wash. 374, 29 P. (2d) 679, recognize that this statute has its presumptive effect, although the presumption is stronger in cases where the joint board has heard the witnesses testify personally than it is

where the board has before it only a transcript of their testimony. The presumption, however, must still be overcome by a clear preponderance of the evidence.

To determine whether the claimant here has met the burden imposed upon her, it becomes necessary to review the evidence. There is no dispute as to the following facts:

The deceased, W. B. McKinnie, was employed by the port of Longview as a watchman. He worked from four p. m. until midnight. His duties required him to assist in mooring the various ships that docked at the port. His particular assignment in this respect was to assist in receiving the heaving lines thrown from the ships, and with these to pull in the larger lines by means of which the ships were made fast to the dock. Some of the ships, because of their size, required extra-heavy hawsers both at their head and at their stern in order to hold the vessels fast. The work of pulling in these heavy lines for a distance of approximately one hundred or one hundred and fifty feet required considerable effort and strain, so much so that the men working at them were at times exhausted, and when the docking was completed, were sometimes compelled to lie down prone for several minutes to recuperate their strength.

On Wednesday, October 21, 1931, the German motorship Los Angeles came into port at about five p. m. Four men were required to moor the ship, two to take the head lines and two to take the stern lines. Ships of that size used heavy manila ropes about four inches in diameter, and also steel hawsers about one inch in diameter. German ships usually required five or six of these lines at each end, for mooring purposes. Mr. McKinnie and one Harvey Hart worked the stern lines, expending the usual amount of effort required upon such occasions.

After the docking had been completed, Mr. McKinnie resumed his usual duties as watchman. During the year prior to October 21, 1931, Mr. McKinnie had assisted in mooring about one hundred ships of the size and tonnage of the LOS ANGELES, and also many other ships of lesser size. On the day following October 21st, Mr. McKinnie reported for work as usual, and thereafter worked every day until Tuesday, October 27th, including an intervening Sunday. During this period he assisted in mooring a number of ships, all of which, however, were of smaller size than the LOS ANGELES.

On Friday, October 23rd, which was two days after the alleged injury, Mr. McKinnie complained to his wife that he did not feel very well, and for several days thereafter spent a good part of his off time, while at home, lying down and resting. His complaint seems to have been regarding his bowels. During this time, however, he reported for work daily as usual. On Tuesday, October 27th, six days after the alleged injury, Mr. and Mrs. McKinnie drove to Portland, Oregon, to have their eyes examined. While there, they visited a moving-picture show and also a stock exhibit. They left early in the evening, however, because Mr. McKinnie complained of not feeling well, and drove to Vancouver, Washington, where they spent the night. The next day, Wednesday, October 28th, they returned to Kelso, where they resided. On the same day, Mr. McKinnie returned to work in the evening, and reported again, as usual, on the next day, October 29th. During all of this time, he had complained, more or less, to his wife of not feeling well.

On the morning of October 30th, nine days after the alleged injury, Mr. McKinnie, after finishing his work, went home ill. He was taken with vomiting spells, and suffered considerable pain in the abdominal region.

A doctor was summoned, who administered opiates, but with little relief to the patient. That night, Mr. McKinnie died. At the time of his death, he was sixty-four years of age.

Paralleling the facts just outlined, there are certain others which have a material bearing on the case. It appears that, for some years, Mr. McKinnie had had heart trouble, and had been treated for that ailment by Doctor T. Homer Coffen, a heart specialist of Portland, Oregon, from about May 11, 1929, until January 9, 1931. His condition was diagnosed as that of generalized arteriosclerosis, moderate arterial hypertension and angina pectoris. Digitalis was prescribed, and a regimen of diet and physical activity was advised. The patient had improved very considerably by January 9, 1931, although it unquestionably appears that he then still had a marked cardiovascular disease. According to the testimony of Doctor Coffen, he was, on January 9th, "coasting along in very good shape," and would so continue, provided that degenerative changes of age did not set in, and provided further that he took care of himself. He was accordingly warned against the exercise of any considerable physical activity for the reason that any added tax on his already diseased system might cause death.

In the application for rehearing before the joint board, it was alleged, among other things, that the deceased, while engaged in mooring the steamship Los Angeles, was required to exert a tremendous and extraordinary effort in pulling upon the lines; that, at that time, his heart was in a diseased and abnormal condition; and that, as a direct result of the extraordinary exertion above referred to, his heart was strained, causing or producing a thrombosis of the mesenteric vessels and subsequently resulting in death.

In addition to the undisputed facts already outlined,

there was evidence of certain declarations made by Mr. McKinnie to his wife and to his family physician, to the effect that, some six to nine days before, while pulling on a rope, he had felt something give way inside of him. It will be observed that both the time and place of the occurrence referred to by Mr. McKinnie are indefinite and uncertain. There was also medical testimony, in its nature opinionative, to the effect that death was due to mesenteric thrombosis, which, in turn, was caused by the strain suffered by the decedent on October 21st.

It will be noted that the only evidence connecting the injury and death with the alleged strain was supplied by Mr. McKinnie's declarations made some six to nine days after the alleged occurrence. The only witness who might have testified directly upon that issue was Harvey Hart, a fellow employee who was working with Mr. McKinnie at the time. In the majority opinion, Mr. Hart's testimony is set out, but it is very significant that the witness did not testify that anything at all occurred on that occasion except that the ship "was negotiated successfully," and that it was a hard and exhausting pull. Had there been any manifestation of injury or illness at the time, Hart, if anyone, would have noticed it, and had he noticed it, he, as a witness for claimant, would certainly have testified to that effect. On the contrary, it appears that there was no collapse or complaint whatever on the part of Mr. McKinnie at the time, but that, after finishing the work of mooring the ship, he resumed his duties as watchman, completed his regular shift, went home at his usual time, and reported for work the next day and for eight or nine days thereafter, just as he had always previously done. So we have no direct evidence to connect the strain, if any, with the death.

We come next to the medical testimony, which is sup-

posed by the majority to complete the gap. Assuming, for the sake of argument only, that such evidence, if direct, positive and unequivocal, would be sufficient to establish a causal connection between the strain and the death, I am nevertheless satisfied that the evidence of these expert witnesses did not meet the required test.

Doctor E. C. Hackett, the attending physician, testified that, in his opinion, some vegetation had *probably* broken loose from the heart, due to strain, and had shifted to the mesentery tract, *or else* that the strain had caused a hemorrhage of the stomach. In his opinion, the thrombosis existed in the mesentery vein rather than in the mesentery artery, since occurrences of that nature were more likely to take place in the vein. He admitted, however, that this was all theory on his part, as he had no clinical evidence, the diagnosis made by him being based partly on what the deceased had told him. He further testified on cross-examination that he had found no growth in the mesentery; that there was no way of telling how soon a hemorrhage would occur after a thrombus had formed in the vein; that a person might carry a thrombus for years without its breaking loose; and that, in fact, it might eventually break loose either because of, or else entirely without, any strain or exertion whatever. He further testified that he could not say positively that the cause of the workman's death in this instance was a thrombosis of the mesenteric artery or that death was caused by the alleged act of lifting on October 21st.

The majority assert that the doctor's frankness in declining to say positively that death was due to mesenteric thrombosis gives added weight and credence to his opinion that it was. Possibly so, but what of it? It proves nothing but his opinion upon a matter about which there not only could be, but obviously was, a de-

cided difference of opinion, and upon which the joint board came to a wholly different conclusion. Furthermore, the doctor's evidence itself discloses that the result could reasonably be accounted for by conditions or events that had no connection whatever with the work that decedent was performing.

Next is the testimony of Doctor Coffen, the heart specialist. He testified that, in his opinion, the cause of the workman's death was a thrombosis of the mesenteric arteries, which were then in a sclerotic and diseased condition; further, that the mesenteric thrombosis was caused by physical effort *probably* induced by the strain exerted on October 21st. This was the witness who had formerly treated the deceased for a considerable period, who knew his condition and who had stated that the deceased had previously had a very marked cardiovascular disease. He further testified that it was entirely possible for the disease that Mr. McKinnie had to grow progressively worse and cause death without the influence of a single act or of any muscular exertion. When asked whether or not "we are speculating whether his death was due to muscular exertion or just to the progress of a disease," he replied, "Yes, I think that is true."

When a physician frankly states that his conclusion is but a speculation, I do not see how the court can possibly base a positive finding thereon. No matter how many times such statements are multiplied by the testimony of successive physicians, the issue still remains a speculation and nothing more. Speculation, no matter how extended, can never project itself into certainty.

Doctor Manlove, who had never seen the deceased prior to the death, subsequently performed an autopsy. He testified that in his opinion the cause of death was mesenteric thrombosis, although he stated that he had not found anything that he could definitely determine

was a thrombus, nor any obstruction in the mesenteric arteries. He further testified that he had found a large and abnormal heart, a diseased aorta and sclerotic arteries. He could not say whether the mesenteric thrombosis had developed gradually or slowly. He stated that a thrombus might be the result of an injury or else of a disease gradually narrowing the lumen of a blood vessel. He would not say positively that the cause of death was mesenteric thrombosis. His report of the autopsy contained the following anatomical diagnosis:

"Two probabilities are apparent as to the cause of death. The first is:

"1st. Rupture of varicose veins in the esophagus with hemorrhage into the gastro intestinal tract.

"2nd. Mesenteric thrombosis with embolus to the lower lobes of the right lung, producing massive infarction of these lower lobes.

"3. Hypertrophy of the heart and generalized arteriosclerosis.

"4. Pancreatitis."

It will be observed that, while in Doctor Manlove's opinion the cause of death was thrombosis, nevertheless on a post mortem he had found nothing that he could say was a thrombus. Further, assuming that there was a thrombus, the witness admitted that it might be the result of an injury or of a disease such as he had *actually found* in the decedent. Can such evidence be taken and accepted as eliminative of every cause except such as will establish liability? I am satisfied that it can not.

Finally, we have the testimony of Doctor St. Pierre. The majority opinion discloses that this witness, without going into any details, merely testified in a general way that his opinion coincided with that of Doctor Coffen, already mentioned above. His testimony is, therefore, subject to the same weakness as that of the wit-

ness whom he corroborated. In addition to this, however, he also testified that he had not treated many cases of mesenteric thrombosis, and that he had never seen a case of that disease alleged to have been due to muscular exertion. His testimony was frank, I will admit, but it seems to me that it contributed less than nothing to support respondent's theory of the case.

It is true that the record herein shows that there was only one medical expert who held an opinion contrary to those of the four above mentioned. In his opinion, there was no relationship between the alleged strain and the man's death. His opinion was positive in its assertion, and the department had the right to believe and accept it. The majority, however, say that this witness was not under oath at the time, and was not subject to examination or cross-examination. The statute does not require that investigations and reports made by the employees of the department, and before appeal to the joint board, shall be under oath, and, of course, they are not. Furthermore, had claimant desired to examine or cross-examine the department's physician at the hearing before the joint board, she had that right under Rem. Rev. Stat., § 7697 [P. C. §.3488].

But, aside from this countervailing evidence, I come back to the proposition that claimant's evidence through her own medical witnesses was admittedly speculative, and gave rise to nothing but conjecture. It left the matter thus: Death *may have been* due to a combination of a marked preexisting disease and a coincident strain; or, on the other hand, the disease may have progressed to such a point that death was the final and inevitable result, irrespective of any strain whatever. As between the two theories, we can not arbitrarily select the former as being the correct

one, in the face of the findings of the department, which had substantial support in the evidence.

There is one other matter in the majority opinion to which I wish to refer. The following cases are therein cited and relied upon: *Frandila v. Department of Labor and Industries,* 137 Wash. 530, 243 Pac. 5; *Cole v. Department of Labor and Industries,* 137 Wash. 538, 243 Pac. 7; *Metcalf v. Department of Labor and Industries,* 168 Wash. 305, 11 P. (2d) 821; *Falmouth Docks & Engineering Co., Ltd., v. Treloar,* English Law Reports, Appeal Cases 1933, p. 481; and *Jones & Paton, Ltd., v. James,* in the same volume at page 501.

None of those cases, in my opinion, is applicable to the situation presented by the evidence in this case. In the *Frandila* case, a workman, who was afflicted with hardening of the arteries, was chopping a large root at the bottom of a ditch when he suddenly collapsed and died. In the *Cole* case, a man afflicted with a diseased heart was engaged in piling heavy timbers. While exerting "practically the whole of his strength against the timber," he was compelled to desist, and sat down in a semi-fainting condition and with an intense pain about the heart. As a result, he sustained a temporary total disability. In the *Metcalf* case, a man, also afflicted with hardening of the arteries, was rapidly and with great exertion sawing a tree when he suddenly fell over and immediately died. In the *Falmouth* case, a dock laborer, who was afflicted with a form of heart disease, was engaged in unloading heavy bags of sugar; while in the act of lifting a hook to move one of the bags, he fell forward and expired. In the last case cited above, the workman was a sheet dipper in a coal, iron and steel establishment. His work was laborious, and required severe strain. At the conclusion of one of the operations in which he was engaged, he sat down complaining of pain, and within ten min-

utes thereafter died. As in the other cases, he, too, had a preexisting heart disease.

The distinction between those cases and the one at bar is at once apparent. In each of those cases, the injury, and in four of the cases the death, was immediately consequent upon the exercise of exertion and strain. The causal connection was instantly demonstrated. The occurrences spoke their own results. In the present case, so far as the direct evidence is concerned, there was no injury at all. The workman finished the particular operation, resumed his other duties, completed his regular shift, and thereafter returned and performed similar operations for nine days. To supply the missing element of injury, evidence of subsequent declarations by the workman was produced after his death, on which evidence opinions of medical witnesses are advanced as to the symptomatic causes of death, which, in turn, are referred to a previous event. Upon hearsay evidence, therefore, is superimposed a speculation or conjecture, and, with this only as a basis, findings and conclusions establishing liability are made.

For the reasons assigned, I am unable to concur in the result, and therefore dissent.

BEALS, C. J., and TOLMAN, J., concur with STEIN-ERT, J.