[No. 27994. *En Banc.* January 7, 1941.]

McCORMICK LUMBER COMPANY *et al., Appellants,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES *et al., Respondents.*[1]

[1]Reported in 108 P. (2d) 807.

*Poe, Falknor, Emory & Howe,* for appellants.

*The Attorney General* and *T. H. Little, Assistant,* for respondents.

*Ryan, Askren & Mathewson* and *Meyer Horowitz, amici curiae.*

STEINERT, J.—Emma Christina Sellin, whose husband, Olof Ferdinand Sellin, was engaged in extrahazardous employment at the time of his death, filed with the department of labor and industries a claim for a widow's pension. The claim was rejected by the supervisor of the department on the ground that the workman's death was not the result of an injury as defined and contemplated by the workmen's compensation act. On rehearing by the joint board, however, the claim was allowed. Upon the application of the employers of the workman, the matter was again reheard, and, at the conclusion of that hearing, the joint board made an order sustaining the allowance of the pension, and, subsequently, made a further order charging the sum of four thousand dollars against the employers' cost experience. From those orders, the employers appealed to the superior court, and from an adverse judgment by that court have appealed to this court.

Stated broadly, the question presented here is whether or not the death of the workman was caused by an injury sustained in the course of his employment, within the contemplation of the workmen's compensation act.

Olof Ferdinand Sellin was, at the time of his death on January 11, 1937, sixty-one years of age. He had been a logger all of his life, but during the two years immediately prior to January, 1937, his employment had been limited to six weeks' work in July and August of 1936. Prior to 1935, he had been employed intermittently by appellant McCormick Lumber Company, which we will hereinafter refer to as though it were the sole appellant.

In outward appearance, Sellin was a strong, robust man, and, so far as the record shows, had never had any serious illness nor had he ever complained of being sick or unable to work. However, as described by a fellow workman, he was "kind of soft" from having been out of work so long. It appears from some of the testimony that in time past Sellin had been a very heavy drinker of intoxicating liquor, and that, on that account, a former employer had discontinued giving him further work. It is undisputed, however, that Sellin was, during recent years at least, an efficient and conscientious workman. Although he, at times, drank to excess, he limited his indulgences to week ends, and drank only when away from his work.

On Monday, January 4, 1937, Sellin entered the employ of appellant as a pile cutter. On the day before, he had gone from his home in Seattle to Port Ludlow, located on the west side of Puget sound, where the work was to be done. During the course of that trip, he imbibed an excessive amount of intoxicating liquor and by Sunday night was very drunk. He reported for work the next morning, however, and worked throughout the week. So far as the record shows, he did his work satisfactorily. At the end of the week, and after leaving the logging camp, he again procured intoxicating liquor and became inebriated, though not to the extent of his experience the week before.

On Monday morning, January 11, 1937, Sellin arose, apparently as usual, and ate a hearty breakfast. In company with Ed Olson, a fellow workman, he rode on the company's speeder from the camp to the point where the pile cutting was to be done, a distance of about three miles. Olson was seventy-four years of age, but had been working regularly and was in good physical condition. The men carried with them a saw, which had recently been sharpened, two axes, and two hammers. It was a cold, though quiet, morning, the temperature being below the freezing point, and the men were heavily clad.

Arriving at their destination at about eight o'clock, Sellin and Olson walked a distance of approximately three hundred feet and entered upon their work of cutting piles. The ground in that vicinity was open and level. Each of the men "undercut" a fir tree approximately twenty-four inches in diameter, and then both of them sawed down the two trees which had been undercut. The work of undercutting and sawing down the two trees consumed about twenty or twenty-five minutes. Sellin, complaining that his feet were cold, thereupon built a fire nearby. After warming himself before the fire for fifteen or twenty minutes, he resumed his work and proceeded to undercut a third tree, preparatory to sawing it down. The process of undercutting the tree to a depth of four or five inches consumed about five minutes.

The two men then took the saw, which was six or seven feet long, and weighed five or six pounds, and began sawing the tree at the point of the undercut, which was three or four feet above the ground. As they sawed, the men were stationed on opposite sides of the tree and occupied normal standing positions. The work of undercutting was not particularly difficult, nor was any unduly strenuous effort required to pull

the saw. The men were working at an ordinary speed, although it would have been considered fast for one who was not accustomed to the work or who was not in good physical condition. Sellin had made no complaint other than that he was cold, and seemed to be working in his customary manner.

The two men continued to saw for about five minutes, and had reached a point about two-thirds of the way through the tree, when suddenly Olson felt the saw jerk and heard Sellin groan. On looking around, Olson discovered that Sellin had fallen to the ground. It appears that Sellin had suddenly collapsed and died. During the sawing process, the tree had not swayed nor had the saw pinched. The jerk apparently was caused by Sellin's collapse. According to Olson's statement, there was no evidence that Sellin had been perspiring.

A post-mortem examination of the body revealed that the deceased had been suffering from chronic conditions of endocarditis, myocarditis, and gastritis, which conditions, according to the testimony of the coroner, had arrived at an acute stage about a week before the death. The coroner also found a highly inflamed condition of the decedent's stomach and at first suspected the presence of an irritant poison, but, on being informed that the deceased had been drunk a short time before, concluded that it was alcoholic poisoning. No analysis of the gastric contents was ever made.

The evidence as to the cause of death consisted of expert opinions, and, as is so often the case, those opinions were in direct conflict. The coroner, a physician, testified that, in his opinion, the death was caused by the conditions found in the post-mortem examination and as above related, and that such conditions would cause death even in the absence of any exertion on the part of the afflicted individual. To rebut that testimony,

the department called as witnesses two heart specialists, residents of Seattle, one of whom had performed, during the preceding three years, over 1650 autopsies, and the other of whom had limited his practice for over eighteen years to diseases of the heart.

The first of those two witnesses expressed his opinion unequivocally that the exertion of the workman at the time and under the circumstances described above was a very definite, contributing factor to his death, and that, while the excessive use of alcohol would account for the gastritis that was found, it had no particular bearing upon the workman's demise. The other physician, in response to a lengthy hypothetical question embodying the evidence in detail, testified as follows:

"A. I would say that the exercise that he [Sellin] undertook was a contributing factor in his death. Q. Will you state why, Doctor? A. Because I think that called upon his heart for more exertion than his heart at that particular time was able to perform."

As already indicated, the joint board, after a review of the testimony, made a finding that Sellin's death was attributable to the exertion undertaken at the time of his injury and concluded that the death was compensable under the statute. Upon a review of the same evidence the superior court affirmed the joint board's decision.

Under the statute, in full force and effect at the time of Sellin's death, the decision of the department is to be taken by the court as being *prima facie* correct, and the burden of proof is upon the party attacking the decision. Rem. Rev. Stat., § 7697 [P. C. § 3488]. Our cases upholding that rule are legion, and need not be cited.

An examination of the record leads us to the conclusion that the decision of the joint board is supported

by the great preponderance of the evidence. This conclusion would ordinarily be sufficient to dispose of the case, but appellant has raised a question which it asserts must, if properly decided, result in a reversal of the action taken by the joint board in allowing the pension.

Appellant's contention is that, where, as in this instance, a workman, who is suffering from an acute, preexisting diseased condition, engages in his usual work under circumstances which require no extra or unusual strain or effort, and suddenly dies while engaged in that work, his death is not the result of an "injury," as defined by the workmen's compensation act. The proposition thus advanced requires an examination and analysis of former and present statutes affecting the question, and a consideration of a number of our decisions construing those statutes.

The original workmen's compensation act, adopted in 1911, defined "injury" as follows:

"The words injury or injured, as used in this act, refer only to an injury resulting from some fortuitous event as distinguished from the contraction of disease." Laws of 1911, chapter 74, p. 346, § 3.

In 1926, this court had occasion to construe that statute in the case of *Frandila v. Department of Labor & Industries,* 137 Wash. 530, 243 Pac. 5. In that case, the workman, while engaged in digging a ditch and chopping a root at the bottom of the ditch, suddenly collapsed, and within about fifteen minutes died. The work of digging and chopping was "hard." The testimony established that the workman was suffering from hardening of the arteries and that he died from either a rupture of a blood vessel or from embolism. The widow's claim for compensation was rejected by the department on the ground that the death of the workman was not caused by a "fortuitous event," in that

there was no unusual strain or exertion, but was occasioned by hardening of the arteries, a slow, progressive disease which, when sufficiently advanced, produces death though there be but little, if any, exertion. The superior court reversed the action of the department and ordered that the claim be allowed. In affirming the superior court, this court prefaced its pronouncement of the law with the statement that the hardened arteries, coupled with overexercise in the course of the employment, caused either the hemorrhage or embolism, and that the chopping of the root was a definite and particular occurrence which was a contributing, proximate cause of the death. The court then said in its opinion:

"The question of whether an injury has been the result of an accident or an accident arising out of the employment, which are narrower terms than fortuitous event, has been considered by many courts, and the result of these decisions seems to be, that an accident exists when a man undertaking work is unable to withstand the exertion required to do it, whatever may be the degree of exertion used or the condition of the workman's health."

In support of that statement of the law, the opinion reviewed many cases, both American and English. Lengthy quotation was made from, and particular emphasis was laid upon, the English case of *Clover, Clayton & Co. v. Hughes,* 26 Times L. R. 359, in which the Lord Chancellor said, among other things:

"An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of health."

The opinion in the *Frandila* case also reviewed certain of our own decisions involving a consideration of the question of "fortuitous event," and concluded that those cases were in harmony with the cases re-

ferred to from other jurisdictions. Near the conclusion of the *Frandila* opinion, however, this court made the following statement:

"Where a workman, not in perfect health, during the course of his employment makes an *extra exertion* which, in addition to his infirmity, causes an injury, such injury is a fortuitous event, and brings him within the operation of the compensation." (Italics ours.)

In view of the fact that the court in the *Frandila* case had said, in the early part of its opinion, that the work of digging and cutting roots was "hard," and because of the use of the words "extra exertion" in the latter part of the opinion, appellant here insists that conditions of that kind must be present in order to render the injury and resulting death compensable.

Following the *Frandila* case, *supra,* came the case of *Cole v. Department of Labor & Industries,* 137 Wash. 538, 243 Pac. 7. In that case, a workman, comparatively vigorous and well for one of his age, and who had been accustomed to hard work, was, upon a certain occasion, engaged in piling heavy timbers. There was testimony that the workman was afflicted with heart and artery disease, although he did not seem to be aware of it. While "exerting practically the whole of his strength against the timber," he suddenly became conscious of intense pain in his chest, about the heart, and sat down in a semi-fainting condition. The reason which led this court to the conclusion that the circumstances were sufficient to support a finding of a "fortuitous event," was that,

"While this affliction, suddenly coming upon Cole, may have been, in a sense, at or near the culmination of his general affliction, it, nevertheless, seems clear from the testimony that what he there did, by putting forth his strength, caused the breaking or giving away of something about his heart."

The *Frandila* case, *supra,* was cited as being decisive of the question then before the court. Appellant here, however, points out the fact that, in the *Cole* case, again, the workman had exerted practically the *whole of his strength.*

At the very next session of the legislature, following the decision in the *Frandila* and *Cole* cases, *supra,* the definition of the word "injury" was materially changed to read as follows:

"The word 'injury' as used in this act means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom." Laws of 1927, chapter 310, p. 815, § 2, Rem. Rev. Stat., § 7675; reenacted by Laws of 1939, chapter 41, p. 121, § 2, Rem. Rev. Stat. (Sup.), § 7675 [P. C. § 3470].

Since the adoption of that amendment, there have been a number of cases, cited by counsel, which evince our understanding and interpretation of the statute as it now stands. For convenience of discussion, we classify the cases in three groups.

The first group includes such cases as *Pellerin v. Washington Veneer Co.,* 163 Wash. 555, 2 P. (2d) 658, and *Flynn v. Department of Labor & Industries,* 188 Wash. 346, 62 P. (2d) 728. In the *Pellerin* case, which involved an employee who had contracted carbon bisulphide poisoning, it was held that the term "injury" applied strictly to sudden and tangible happenings of a traumatic nature, occurring from without, and producing an immediate or prompt result, as distinguished from an occupational disease. In the *Flynn* case, it was held that the word "injury," as defined in the statute, did not cover a situation where a workman swallowed a portion of chewing tobacco, causing him to choke and cough and producing a dilation of the heart which resulted in sudden death. It was held that

the "happening" was neither "from without" nor of a "traumatic nature." Those cases, though citing and correctly construing the statute, are, manifestly, of no aid to us here because of their peculiar facts.

The second group of cases includes the following: *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821; *McArthur v. Department of Labor & Industries,* 168 Wash. 405, 12 P. (2d) 418; *McKinnie v. Department of Labor & Industries,* 179 Wash. 245, 37 P. (2d) 218; *Smith v. Department of Labor & Industries,* 179 Wash. 501, 38 P. (2d) 212; *O'Toole v. Department of Labor & Industries,* 182 Wash. 202, 46 P. (2d) 388; and *Devlin v. Department of Labor & Industries,* 194 Wash. 549, 78 P. (2d) 952.

In *Metcalf v. Department of Labor & Industries, supra,* a workman, while occupying an unusual position on the ground, was rapidly sawing a log, in order to remove an obstruction in a road. The task required more than ordinary exertion. While engaged in the work, the man fell over, and, without regaining consciousness, died of a cerebral hemorrhage. In upholding a claim for compensation, this court said:

"The fact that his arteries had so hardened that death was likely to result 'from a sudden and tangible happening of a traumatic nature,' does not deprive Mr. Metcalf's widow and minor child of their right to statutory benefits. It was not the legislature's purpose to limit the provisions of the workmen's compensation act to only such persons as approximate physical perfection."

In the *McArthur* case, *supra,* a workman, while in an unusual position, was exerting great force in shoving a heavy slab of stone into place. As a result, he ruptured a duodenal ulcer. The workman's own physician and medical witness testified that, had there been no preexisting disease, the injured workman probably would not have been disabled at all. In affirming a

judgment for the workman, this court held that the case was controlled by the *Metcalf* case, *supra,* quoting the concluding sentence of the paragraph set forth above.

In *McKinnie v. Department of Labor & Industries, supra,* an *En Banc* decision, a workman sixty-four years of age was engaged in helping to moor a large steamship. As a result of a tremendous effort exerted by him in pulling upon one of the mooring lines, he suffered a severe strain, which produced a mesenteric thrombosis, causing his death nine days later. The workman had been afflicted with hardening of the arteries for some years immediately prior to his death. It was held, by a divided court, that the widow of the workman was entitled to a pension. The *Metcalf* and *McArthur* cases, *supra,* were approved, and reference was made to the holding in the *Frandila* case, *supra,* that the workmen's compensation act applies

" . . . where it appears that the workman collapsed from severe or over-exercise, coupled with pre-existing disease, such as hardening of the arteries."

The opinion also mentioned, as "two excellent cases," *Falmouth Docks & Engineering Co., Ltd. v. Troloar,* Eng. L. R., App. Cases 1933, p. 481, and *Jones & Paton, Ltd. v. James,* Eng. L. R., App. Cases 1933, p. 501. From the latter case, the following statement was quoted:

" 'An accident arises out of a workman's employment within the meaning of s. 1 of the Workmen's Compensation Act, 1925, when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of the workman's health. In each case the arbitrator adjudicating upon a claim for compensation must consider whether in substance, so far as he can judge on such a matter, the accident came from the disease alone, so that whatever the man had been doing it

would probably have come all the same, or whether the employment contributed to it.' "

In *Smith v. Department of Labor & Industries, supra,* a workman, sixty-eight years of age and suffering from chronic myocarditis, came to his death while violently exerting himself in helping to load and unload certain ground scrapers. The department contended that his death was due to the natural progress of the disease. This court held that it was immaterial that the workman was suffering from a chronic disease from which he " 'might have died just the same if he hadn't been doing a thing,' " and stated that the real question was whether or not

". . . the death was caused by a strain arising out of the ordinary work of the deceased operating upon a condition of body which was such as to render the strain fatal."

Our former cases, together with others from foreign jurisdictions, were cited and approved and towards the close of the opinion it was said:

"The case at bar is within the rule that an accident arises out of a workman's employment within the meaning of the workmen's compensation act when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of the workman's health."

In *O'Toole v. Department of Labor & Industries, supra,* a workman, apparently in good health, died suddenly while in the course of his employment as a choker setter. No one saw the workman at or immediately prior to the time of his death, and just how the event occurred no one knew. It appeared later, however, from a post-mortem examination, that the workman had for some time been in a serious physical condition due to arteriosclerosis. This court held that the

evidence was insufficient to justify the findings of the trial court to the effect that there had been a severe or violent exertion on the part of the workman, or that any such exertion had caused the workman's death. Appellant here considers that case as strong authority for the proposition that an injury to be compensable must have been sustained through exertion that is "severe and strenuous."

The case of *Devlin v. Department of Labor & Industries, supra,* presented another situation wherein a workman afflicted with heart disease had engaged in strenuous labor, during which he was seized with a heart attack, resulting in his death nine days later. The opinion in that case defined the words "strain" and "overexertion," as used in the trial court's instructions, to mean, or imply, tension and excessive physical effort, within the rule announced in the preceding cases that:

"An accident exists when a man undertaking work is unable to withstand the exertion required to do it, whatever may be the degree of exertion used or the condition of the workman's health."

It will be observed that, in all of the six cases included in the second group, the disease with which the workman was afflicted had reached an advanced stage, and, as a result thereof, death was possible, or likely, to occur at any time. In five of those cases, compensation was allowed. In the one case where recovery was not allowed, the *O'Toole* case, the evidence was found to be insufficient to establish a cause of action compensable under the statute. It should also be noted that, in the same five of those six cases there was evidence of some excessive or unusual strain exerted by the workman at the time of the particular occurrence. And, in the opinion in each of those cases, some such expression as "greater strain than usual," "violent ef-

fort," "great force in an unusual position," "severe and strenuous exertion," or "overexercise" was used.

Appellant therefore contends that those decisions were rested upon the existence of those particular factors, and that they established a rule and precedent for the determination of cases according to the presence or absence of such factors. Specifically, appellant's contention is that, where a workman is afflicted with some serious disease which is likely to eventuate in death at any time, his death or incapacity, though sustained during the time that he is actually working, is not compensable, unless he was being subjected at the time to some severe or unusual strain; and that, where the work is being done under usual conditions with normal exertion, and death or incapacity results, there is no injury within the meaning of the statute.

We will consider that contention further after we have referred to the third group of cases, but it is appropriate to say at this point that the cases thus far considered uniformly declare or recognize these two principles: (1) That the provisions of the workmen's compensation act are not limited to such persons only as approximate physical perfection, and (2) that an accident arises out of a workman's employment within the meaning of that act when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of the workman's health.

The third group of cases comprises *Daugherty v. Department of Labor & Industries,* 188 Wash. 626, 63 P. (2d) 434, and *Bergagna v. Department of Labor & Industries,* 199 Wash. 263, 91 P. (2d) 551. Both of those cases were *En Banc* decisions, were recently decided, and represent a division of opinion on the part of the members of this court.

In the *Daugherty* case, *supra,* a brakeman of a log-

ging train was overcome while uncoupling one of the cars from the remainder of the train. Eyewitnesses testified that the workman stooped over as if intending to "cut the air" by uncoupling the air line; that he then suddenly stood up, lurched backwards with his hands in the air, and fell to the ground. He died within fifteen minutes without having regained consciousness.

A physician, who had attended the workman about two weeks before his death, testified that a physical examination made at that time revealed some tenderness in the abdomen, a slight enlargement of the heart, a systolic murmur, and some hardening of the arteries. In the opinion of the witness, the condition of the workman was not serious at that time, and the workman might have lived an indefinite number of years. However, as stated in the opinion of this court, the workman might, as the result of his preexisting condition, have dropped dead at the precise moment of uncoupling the car. The department contended that death was the immediate result of the natural physical condition of the man, and was not in any way contributed to by the work that he was then doing. The claimant, on the other hand, contended that the workman had been struck by the heavy iron coupling attached to the air line. The only evidence of a blow from the coupling was an abrasion which was subsequently discovered upon the workman's chest, in the region of the heart. A nurse, however, testified that, in an attempt to revive the workman, shortly after the occurrence, she had applied a hot water bottle to his chest and that the bottle had left a burn. The trial court found from the evidence that there had been a blow from the coupling and that upon receiving the blow, the workman had staggered from between the cars, stumbled, and fallen to the ground with such force as to cut a

gash in the back of his head. In upholding the claim of the widow, this court said:

"The workmen's compensation law is intended to compensate for the hazards of employment. An element of this hazard to a workman not in perfect health or suffering from some progressive ailment, is the possibility that, in his impaired condition, he may be less able to withstand an untoward incident occurring in the course of employment. In this case, the workman, with a wife and eight small children to support, had no choice but to carry on. The act does not contemplate that its benefits shall be limited to those workmen only who can register a perfect physical score. . . .

"While the blow from the air hose, found by the court, might not have been sufficient, in the case of a man in normal health, to have caused death, yet, as testified by medical experts, it could, in the weakened condition of decedent's heart have caused death."

The *Metcalf, McKinnie,* and *Smith* cases, *supra,* were cited, and the rules hereinbefore stated were reiterated.

In *Bergagna v. Department of Labor & Industries, supra,* a coal miner sixty-one years of age suffered a heart attack while at work in a mine, and died a few minutes thereafter. It appeared from the evidence that, three or four hours before the attack, the workman had sustained a fright, occasioned by the fall of a quantity of rock in the mine. An autopsy performed upon the decedent disclosed that he had been afflicted with fatty degeneration of the heart, chronic myocarditis of long standing, and hardening of the arteries. The immediate cause of death was heart failure. A widow's claim for pension was rejected by the department on the ground that there was no proof of injury to the workman during the course of his employment, and that death was not the result of trauma as defined in the workmen's compensation act. The superior court affirmed the departmental decision. On appeal

to this court, the case was heard *En Banc,* and the judgment of the superior court was reversed. We quote, from the majority opinion in that case, two paragraphs which indicate the reasoning employed by the court and the basis for its decision:

"This case is one of a class which courts have found not easy of solution. Our own decisions have accepted the rule that an accident arises out of the employment, under the terms of the workmen's compensation act, when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of the man's health. [Citing a number of cases to which reference has been made above.] . . .

"Here, the workman collapsed, while engaged in heavy muscular work, a relatively short time after he had experienced some shock or fright as the result of the fall of a mass of rock from the roof of the mine, in close proximity to him. Considering the condition of his heart, as developed by the autopsy, it hardly requires the testimony of medical men to establish that the man's collapse could have been, and, indeed, in all probability was, *precipitated by the degree of exertion required for his work, even if the effect of shock or fright be eliminated.* True, he could have died in bed or away from the mine. But he did not die in bed. He was stricken in the mine while engaged in work that admittedly could subject his heart to a strain beyond its capacity to withstand." (Italics ours.)

It will be observed that, in both the *Daugherty* case and the *Bergagna* case, *supra,* there was an element which is not present in the case at bar. In the *Daugherty* case, there was a blow, and in the *Bergagna* case there was fright, although in the latter case exertion was considered to be the efficient cause, regardless of the element of fright. In the case at bar, we have simply exertion on the part of the workman, coupled with a preexisting disease.

In addition to the cases already cited in this opinion,

we call attention to a recent decision of this court rendered subsequent to the time of argument of the present appeal: *Barnes v. Department of Labor & Industries,* 6 Wn. (2d) 155, 106 P. (2d) 1069.

In that case, a machinist was engaged with the aid of two assistants, in changing the main gear on a locomotive crane. The work entailed exceptionally strenuous and unusual exertion on the part of the machinist in lifting a section of a cogwheel. After the task had been completed and the workman had gone home, he complained of pain in his chest and in the region of his heart. He returned to his place of employment on the third day thereafter, and, while engaged in doing some comparatively light work, suddenly collapsed, and eleven hours later died. A post-mortem examination disclosed that death had resulted from a thrombus, or blood clot, which had completely blocked the right coronary artery. Although there was considerable expert testimony to the contrary, the joint board found, in effect, that the decedent's exertion was a material factor causative of the thrombus which ended the workman's life. The board thereupon entered an order granting the widow's claim for pension. The superior court affirmed the order, and the employer appealed from the court's judgment. In affirming the judgment, this court said:

"The workmen's compensation law was enacted in furtherance of sound public policy for the benefit of those who engage in extrahazardous employments. It applies to all alike, the young and the old, the weak and the strong, the healthy and the diseased. One of the hazards of employment to a workman afflicted with disease is that his work may involve exertions and strains which his weakened constitution may be unable to withstand. An injury which a workman sustains in the course of his employment is compensable under the act if it results from any shock, strain, or exertion which he is then unable to endure in his condition of

health, whatever that may be. [Citing practically all of the cases mentioned above.]"

As has already been indicated, it is appellant's position that the rule to be adduced from the foregoing authorities is that an injury resulting from physical exertion, coupled with a previous diseased condition of the workman, is not "traumatic" within the meaning of Rem. Rev. Stat., § 7675, unless the exertion is violent or strenuous, or is performed under unusual conditions; and that ordinary work, or work performed in the manner to which the workman is accustomed, without extra strain or overexercise, even though it be coupled with a preexisting disease, however serious or acute, cannot be held to be the cause of an "injury" within the meaning of the workmen's compensation act.

It is true that, in practically all of the cases hereinbefore cited, there was some strain or effort beyond that ordinarily employed by the particular workman. However, the rule which this court has repeatedly and emphatically stated in those same decisions was not limited to those conditions. What this court has positively declared as its accepted rule, under both the original and the present definition of "injury" is this: An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, *whatever the degree of exertion or the condition of the workman's health.*

To say now that some unusual effort or strain is necessary to render death compensable, would not only be in direct conflict with the plain and emphatic language of our holdings, but would also introduce an element of uncertainty and confusion, in that every case would present a problem as to the standard to be used in determining whether or not, in a given instance, the exertion was unusual, and whether or not the workman was expending only the ordinary exertion re-

quired in a particular line of employment. The rule above stated has been accepted in this state after much discussion and diversity of opinion. It is now firmly established, and we see no reason for departing from it.

Since the board found that there was a causal relation between the workman's exertion and his death, and since the evidence supports that finding, the case is within the accepted rule.

The judgment is affirmed.

BLAKE, C. J., MAIN, BEALS, JEFFERS, MILLARD, and DRIVER, JJ., concur.

SIMPSON, J. (dissenting)—I am of the opinion that the majority has failed to properly interpret the provisions of our workmen's compensation act, in so far as the act deals with the purposes underlying it and the definition of that which is meant to be compensable thereunder. It is, of course, obvious that the definition of a compensable injury under the act requires an inquiry into both the wording of the section dealing therewith and the wording of the sections setting forth the basic, fundamental objectives sought by the framers of the act.

It must be remembered that the act was passed to replace the common law right of action, which the workman might have for injuries occasioned by the negligence of the employer or his fellow workmen, and to compensate the employee for industrial accidents, in which no negligence was present. The act was not passed to guarantee a life insurance or a pension to the employee. *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466. The intent of the legislature was simply to provide payment for accidental injuries occurring in extrahazardous employment.

In construing the act, it is the duty of the court to interpret it as a whole and adopt that construction which will harmonize the entire statute and make it sensible and effective. *Klippert v. Industrial Ins. Department,* 114 Wash. 525, 196 Pac. 17; *Murray v. Department of Labor & Industries,* 151 Wash. 95, 275 Pac. 66; *Carsten v. Department of Labor & Industries,* 172 Wash. 51, 19 P. (2d) 133; *Hill v. Department of Labor & Industries,* 173 Wash. 575, 24 P. (2d) 95; *Long v. Thompson,* 177 Wash. 296, 31 P. (2d) 908; *Lindquist v. Department of Labor & Industries,* 184 Wash. 194, 50 P. (2d) 46.

In addition, when the statute is amended, we must consider the intent of the lawmaking body as evidenced by the statute as amended and the evident purpose of the amendment. *Sandahl v. Department of Labor & Industries,* 170 Wash. 380, 16 P. (2d) 623.

Looking to Rem. Rev. Stat., § 7674 [P. C. § 3469], we find:

"There is a hazard in all employment, but certain employments have come to be, and to be recognized as being inherently constantly dangerous. This act is intended to apply to all such inherently hazardous works and occupations. . . . "

Clearly, it was against the *hazards* of the employment itself that protection was to be had. This is again emphasized by Rem. Rev. Stat., § 7676 [P. C. § 3471], which provides:

"Inasmuch as industry should bear the greater portion of the burden of the cost of its accidents, each employer shall . . . pay . . . ."

It is apparent that the act as a whole was intended by the legislature to charge industry with the burden of compensating those of its workers to whom the hazards of industry had brought injuries, and that it was not intended as a blanket provision for compensa-

tion to employees for any and all disabilities sustained by workmen while in the course of their employment. It was the hazards, the accidents of industry, which the act was to cover, and not those disabilities whose origins lay elsewhere than in industry itself.

Keeping the foregoing principles in mind, let us look to the statutory definition of the word "injury," for it is the interpretation to be given to that word which is controlling in the disposition of the case at bar.

The original act, Laws of 1911, chapter 74, p. 346, § 3, defined "injury" as follows:

"The words injury or injured, as used in this act, refer only to an injury resulting from some fortuitous event as distinguished from the contraction of disease."

The identical definition was used in the Laws of 1917, chapter 120, p. 474, § 1; Laws of 1919, chapter 131, p. 342, § 2; and in the medical aid act, Laws of 1921, chapter 182, p. 720, § 2.

In 1926, this court decided the case of *Frandila v. Department of Labor & Industries*, 137 Wash. 530, 243 Pac. 5, in which case a workman, afflicted with hardening of the arteries, collapsed and died while chopping a root at the bottom of a ditch, the work having been usual, calling for no overexertion. We held that his widow was entitled to compensation, and that an injury, within the definition of the act, existed whenever a man undertaking work was unable to withstand the exertion required to do it, whatever might be the degree of exertion used or the condition of the workman's health.

The legislature, at its next session, sought to avoid the effect of the holding in the *Frandila* case, *supra*, by amending the definition of "injury" to read as follows:

"The word 'injury' as used in this act means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and oc-

curring from without, and such physical condition as results therefrom." Laws of 1927, chapter 310, p. 815, § 2.

The same definition was carried into the Laws of 1929, chapter 132, p. 325, § 1, Rem. Rev. Stat., § 7675 [P. C. § 3470].

It is readily to be seen that the legislative intent, as expressed by the definition of "injury," in the 1927 and 1929 acts, as well as by the general statements as to the purpose of the law as a whole, was directed at a type of occurrence far different from that which we brought within the operation of the act by our holding in the *Frandila* case, *supra,* and which we would again have to bring within the operation of the act in the case at bar, if recovery were allowed.

In support of this contention, I cite *Pellerin v. Washington Veneer Co.,* 163 Wash. 555, 2 P. (2d) 658 (1931), and *Flynn v. Department of Labor & Industries,* 188 Wash. 346, 62 P. (2d) 728 (1936).

In the first case, we stated:

" 'Traumatic' is defined by Webster as 'a wound; of or pertaining to wounds; applied to wounds.' The words in the act of 1927, defining injury, referring to a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, therefore *undoubtedly mean some blow or wound,* suddenly and tangibly happening, producing an immediate or prompt result as opposed to something in the nature of occupational disease with which we dealt in the *Seattle Can Co.* decision, *supra* [147 Wash. 303, 265 Pac. 739].

"The manifest intention of the legislature in the enactment of the new definition of injury was to make more certain the definition of injury and make it apply strictly to *sudden and tangible happenings occurring from without of a traumatic nature* producing an immediate or prompt result, as distinguished from anything like an occupational disease." (Italics mine.)

In the latter case, this court held:

"The statute is in no respects ambiguous or uncertain. It is plain, clear, concise, and is therefore not subject to construction, but the language used must be given its plain and ordinary meaning. Had it been the legislative intent to cover every kind of physical impairment occurring while a workman was in the course of his employment, it might very easily have employed language to express that intent, but it did not do so.

"The statute, segregated into its component parts, indicates very clearly that first, there must be a 'happening;' second, the happening must be of a 'traumatic nature;' and third, the happening must occur 'from without.'

"It seems apparent that the two phrases, 'of a traumatic nature' and 'occurring from without,' both modifying as they do, the word 'happening,' can only mean that there must be an external act or occurrence which caused the injury and that such act or occurrence must be 'of a traumatic nature.' The source as well as the nature or character of the 'happening' are both determinative factors under the statutory definition.

"In this case, the source or cause of the physical impairment of the deceased workman did not occur outside his body or 'from without.' According to the admitted facts, he called, swallowed some tobacco, coughed, strangled, and from the coughing a fatal strain was placed upon his heart. The cause therefore originated within and not without the body. But, even if there was anything without the body in the origin of the cause, then that which was without was not 'of a traumatic nature.'

"If there was a quick intake of breath following the calling, then air only entered, and air entering through natural passages and in a natural way cannot be a 'happening of a traumatic nature.'

"There was then no 'happening of a traumatic nature . . . occurring from without.' Therefore, there was no 'injury' within the contemplation of the statute."

The two cases, from which I have just quoted, have never been changed, modified, or overruled by this court. They stand as the expressed interpretation by this court of the meaning of the amendments of 1927 and 1929. The legislature has evidently been satisfied with our interpretation of those acts because the law has not been changed since 1929.

The legislature must be held to have knowledge of court decisions, and, where legislatures fail to amend statutes construed by the court, they are doubtless satisfied with the construction placed upon it by the court. *Barlow & Sons v. H. & B. Lumber Co.,* 153 Wash. 565, 280 Pac. 88.

It is established by the evidence in the instant case that the work being done by the decedent at the time he suffered his heart attack was not in any way extraordinary, and called for no overexertion. It was simply the usual effort expended in wielding a saw, and was not complicated in any way by any unusual circumstances. In order for us to award compensation, therefore, we must again adhere to the principle set forth in the *Frandila* case, *supra,* to the effect that disability following *any exertion* which is too much for the individual in question constitutes an injury within the meaning of the act. In addition, we must disregard the amendments of 1927 and 1929 and our holdings in the *Pellerin* and *Flynn* cases, *supra.*

It is true that statements have appeared in several more recent holdings of this court which seem to indicate that we still adhere to the position taken in the *Frandila* case, *supra.* However, as is pointed out in the majority opinion, not one of those cases presented a situation calling for such statements, and not one of them is applicable to the factual situation presented by the case at bar, namely, a situation in which nothing

unusual occurred, in which no overexertion or overstrain took place.

We are, then, faced with the problem of again having to interpret the legislative intention in a case where there was a preexisting bodily weakness of a progressive nature, the climax thereof being hastened by ordinary exertion, which happened to be used while the workman was on the job, performing his usual functions, and without mishap. Since the legislature changed the definition of the word, "injury," at a date subsequent to the *Frandila* case, *supra,* that case is not binding upon us. I therefore feel free to consider the question anew.

My study of cases decided in other jurisdictions has brought to light a number of instances in which appellate courts, dealing with statutes similar to ours, have expressed themselves as not regarding injuries of the nature of that now before us as coming within the wording of their acts. Although the acts in some of the other jurisdictions refer to "injuries by accident," or to "accidental injuries," whereas our act refers to injuries which are "traumatic," I believe the principles which govern the cases are applicable to either type of act. As a matter of fact, the word "traumatic," when used in workmen's compensation acts, has been construed to refer to the emanation of an accident, as contradistinguished from disease. *Prino v. Austin Co.,* 120 N. J. L. 19, 197 Atl. 731.

In *Lesko v. Lehigh Valley Coal Co.,* 270 Pa. 15, 112 Atl. 768, the dismissal of the claimant's petition for compensation was sustained, the claim having been based on the suffering of a cerebral apoplexy while engaged in ordinary work. The evidence was to the effect that the claimant was afflicted with arteriosclerosis and an enlarged heart. The findings of the board, approved by the appellate court, were as follows:

" 'That at the time of the cerebral hemorrhage and the consequent apoplexy the claimant was performing the kind of work he had been engaged in off and on during the entire day; that there was no unusual happening in the course of his work, nor marks nor evidence of external violence to his person, nor was there shown any sudden unlooked for occurrence in the course of his work calling for any extra exertion or strain other than that required by his usual and ordinary labor for the day and that what happened to him was not an accident within the meaning of the Compensation Act of 1915.' "

*Gausman v. R. T. Pearson Co.,* 284 Pa. 348, 131 Atl. 247, presented a factual situation in which compensation was denied to the claimant, there having been no evidence of any unusual strain, exertion, or mishap. I deem the language of the court worthy of quotation at this point:

"Disability, overtaking an employee at his work, is not compensable unless the result of accident. And the burden is on claimant to prove it was such and not from natural causes: Skinner's Pennsylvania Workmen's Compensation Law 54, and cases there cited. True, Dr. Frederick attributed the exhaustion, or stroke, to claimant's exertion in the performance of his work and expressed the opinion that but for the work it would not have happened at that time; in other words that the disability was hastened by the work; even so, that alone would not constitute an accident; otherwise it would be unsafe to give employment to anyone advanced in years. Disability, hastened by such exercise, cannot be treated as accidental; neither can death or disability, overtaking an employee in the course of his employment and resulting from a natural cause; if it could, it would render the employer an insurer of the life and health of the employee."

In *Mooney v. Yeagle,* 107 Pa. Super. Ct. 409, 164 Atl. 82, a plumber had been suffering from a progressive heart disease, and finally succumbed while at his reg-

ular work. No unusual circumstances were found to have existed at the time he suffered the collapse, and his widow's claim was denied. The court, after citing the *Lesko* and *Gausman* cases, *supra*, with approval, went on to say:

"A careful review of the record in this case has failed to disclose any sufficient competent evidence on which to base the finding that Mooney's death was due to an accident—using that term as construed by the decisions of the Supreme Court—in the course of his employment, rather than from the natural development of the disease of the heart from which he was suffering, which may have been hastened by his usual and ordinary work as a plumber, but for which, since it caused no great or unusual physical strain, the law does not make his employer liable by way of compensation."

The same rule as was set forth in the foregoing cases was applied by the Pennsylvania court to situations similar to the case at bar in *O'Neill v. Lehigh Coal & Nav. Co.*, 108 Pa. Super. Ct. 425, 165 Atl. 60; *Pelusi v. Mandes*, 109 Pa. Super. Ct. 439, 167 Atl. 456; and *Foster v. Borough of State College*, 110 Pa. Super. Ct. 452, 168 Atl. 693.

The case of *Madden's Case*, 222 Mass. 487, 111 N. E. 379, was cited by this court to sustain the position taken in the *Frandila* case, *supra*, but an examination of it will show that in reality it is a better authority for the position I am taking in this case. The facts of the case show that the claimant suffered a heart strain while engaged in the performance of her ordinary work. The claim was allowed, even though there was a showing that the claimant's heart was weakened by a progressive disease, and that nothing out of the ordinary was done to induce the attack. The court, however, took pains to point out that the Massachusetts act provided for compensation for "personal injuries,"

and distinguished the act from those of other jurisdictions which apply to "accidental injuries," "injuries by accident," etc. Since our act, in effect, does apply only to accidental injuries, it would seem that there is clearly a distinction between the two acts which makes the holding in that case of no particular value to us. However, the Massachusetts court set forth a paragraph which I desire to quote at this time, for, although the court arrived at an opposite conclusion, it would seem to lend weight to the position which I am taking:

"The act is not a substitute for disability or old age pensions. It cannot be strained to include that kind of relief. Its ultimate purpose simply is to treat the cost of personal injuries incidental to the employment as a part of the cost of the business. It does not afford compensation for injuries or misfortunes, which merely are contemporaneous or coincident with the employment, or collateral to it. Not every diseased person suffering a misfortune while at work for a subscriber is entitled to compensation. The relief is so new that the tendency may be to inquire only as to the employment and the injury and to assume that these two factors constitute ground for compensation. But the essential connecting link of direct causal connection between the personal injury and the employment must be established before the act becomes operative. The personal injury must be the result of the employment and flow from it as the inducing proximate cause. The rational mind must be able to trace the resultant personal injury to a proximate cause set in motion by the employment and not by some other agency, or there can be no recovery. In passing upon this question, an humanitarian emotion ought not to take the place of sound judgment in the weighing of evidence. The direct connection between the personal injury as a result and the employment as its proximate cause must be proved by facts before the right to compensation springs into being. *A high degree of discrimination must be exercised to determine whether the real cause of an injury is disease or the hazard of the employment. A disease, which under any rational*

*work is likely to progress so as finally to disable the employee, does not become a 'personal injury' under the act merely because it reaches the point of disablement while work for a subscriber is being pursued.* It is only when there is a direct causal connection between the exertion of the employment and the injury that an award of compensation can be made. The substantial question is whether the diseased condition was the cause, or whether the employment was a proximate contributing cause. In the former case, no award can be made; in the latter, it ought to be made." (Italics mine.)

I am of the opinion that the quoted portion of the case just cited very aptly expresses the point which I am making in this dissenting opinion, even though the court there did not see fit to apply the principles enunciated to the factual situation before it. To me, the very crux of the entire problem is to be found in the question: What was the real cause of the injury, industry or the man's physical condition? To my mind, the use of the approach and guiding concepts set forth in the *Madden* case, *supra,* should lead one to the conclusion that, in the case at bar, wherein the climax of the progressive disease was reached while the victim was engaged in "rational" work, unaccompanied by any excessive strain or exertion, the answer should be that it was the man's physical condition, and not the hazard created by industry, which was the real, the material, cause of the injury.

I quote from a later Massachusetts case in order to point out the fact that the *Madden* case, *supra,* reached a result which is not in accord with the majority of cases dealing with this subject.

"As was said in *Maggelet's Case,* 228 Mass. 57, 62, this court has gone further than most courts in allowing recovery in cases of heart lesions, where there has been a weak heart before the injury was received. *Brightman's Case,* 220 Mass. 17. *Fisher's Case,* 220

Mass. 581. *Madden's Case,* 222 Mass. 487. *Mooradjian's Case,* 229 Mass. 521." *Burn's Case,* 266 Mass. 516, 165 N. E. 670.

In *Jakub v. Industrial Commission,* 288 Ill. 87, 123 N. E. 263, the decedent suffered from a progressive heart ailment, and died from a heart attack sustained while he was engaged in his regular employment, which was the operation of an electric baling press. There was testimony to the effect that the work he was doing would hasten his death. In denying compensation, the court stated:

"In this case there was no evidence tending to prove any accident or accidental injury to the deceased. There was no mark upon his person and nothing from which it could be inferred that an accident had occurred, and it is not claimed that there was any accident but only that the heavy work which he was doing in the ordinary course of his employment caused or hastened his death."

The Michigan act has been construed by the supreme court of that state to be inapplicable to cases in which there was a physical weakness whose climax was simply hastened by the ordinary exertion involved in the work done by the victim. *Kutschmar v. Briggs Mfg. Co.,* 197 Mich. 146, 163 N. W. 933; *Stombaugh v. Peerless Wire Fence Co.,* 198 Mich. 445, 164 N. W. 537; *Tackles v. Bryant & Detwiler Co.,* 200 Mich. 350, 167 N. W. 36. The basis for these holdings was the failure of such injuries to come within the meaning of the term, "accidental injuries," used in the act.

In *McNamara v. Industrial Accident Commission,* 130 Cal. App. 284, 20 P. (2d) 53, the court, in denying compensation, made the following statement:

"Considerable is said in the briefs regarding the liability of the employer for aggravation of a pre-existing disease. Speaking generally, there is no question about such a liability. It is statutory. . . .

However, that claim when asserted must be supported by proof. In a certain sense every day's work consumes so much reserve force of the heart of every laborer. But such fact standing alone will not support an award of compensation chargeable against industry. In the case under consideration both experts testified that every exertion during the entire day of twenty-four hours tends to consume the reserve force of a damaged heart, and in that sense, is an injury to it—is an aggravation to it. But not every such exertion in the line of the employee's duties will constitute a legal claim under the statutes providing for workmen's compensation."

In *Pierce v. Phelps Dodge Corp.*, 42 Ariz. 436, 26 P. (2d) 1017, compensation was denied in a case in which the victim suffered from advanced myocarditis, and in which the court agreed that the death was accelerated to some degree by the ordinary and usual conditions of the work which he did, but not by any sudden or extraordinary strain or fortuitous happening.

The claimant's petition was denied by the court in *Martin v. State Compensation Commission*, 107 W. Va. 583, 149 S. E. 824, the facts of that case being that the decedent had been suffering from a progressive heart disease, and had sustained an attack immediately after helping to push a heavy mine car, such work being part of his ordinary employment. The court recognized the rule which I am supporting in the following language:

"There is a great mass of decisions involving claims where the applicant was afflicted with heart disease at the time of the alleged injury. . . . Without analyzing and discussing those decisions . . . , it may be deduced therefrom that compensation will not be awarded where the employee has chronic heart trouble which has reached such a stage that death is liable to ensue at any time, from any exertion, and death came while he was doing the ordinary work of his employment."

In *DeLille v. Holton-Seelye Co.*, 334 Mo. 464, 66 S. W. (2d) 834, there was a factual situation very similar to that involved in the case under consideration. The victim was suffering from a progressive heart ailment, and sustained an attack immediately following the sawing of a piece of lumber with a ripsaw. Nothing of an unusual nature had characterized his activities. Compensation was denied, the court citing the *Lesko* and *Gausman* cases, *supra,* as authority for the view that disability which is merely hastened by ordinary exertion involved in performing one's usual tasks is not a result of accidental injury, within the meaning of the workmen's compensation act.

The case of *Meldrum v. Southard Feed & Mill Co.*, 229 Mo. App. 158, 74 S. W. (2d) 75, was one in which a workman who had a weak, diseased heart suffered an attack while performing his regular work of loading sacks of meal. In that case, as in the others cited, it was held that the mere fact that the ordinary exertion involved in the performance of the usual duties may have hastened the arrival of the climax of the progressive disease was not enough to constitute an accidental injury within the meaning of the act.

There are a number of cases from the British courts which sustain the view that disability following ordinary exertion is *not* compensable under workmen's compensation acts: *Coe v. Fife Coal Co.*, 46 Sc. L. R. 328, 2 B. W. C. C. 8; *O'Hara v. Hayes,* 44 Ir. L. T. R. 71, 3 B. W. C. C. 586; *Spence v. W. Baird & Co.*, S. C. 343, 49 Sc. L. R. 278, 5 B. W. C. C. 542; *Kerr v. Ritchies,* 50 Sc. L. R. 434, 6 B. W. C. C. 419; and *Black v. New Zealand Shipping Co.*, 6 B. W. C. C. 720.

By way of summation, I wish to reemphasize the following propositions. In the first place, the position which I am taking in no way conflicts with the earlier holdings of this court enumerated in the majority

opinion, since the only case in which there actually was a situation in which the effort expended by the diseased workman was usual and ordinary was the *Frandilla* case, *supra,* and the effect of that case was nullified by the modification of the act in 1927. As for the statements in subsequent cases which are of a similar tone to those appearing in the *Frandila* case, they may be regarded as of no effect, since in none of those cases did the occasion for such statements present itself. In short, they were gratuitous. In each and every one of such cases there was something unusual, something extraordinary, as the majority opinion admits.

In the second place, I wish to reiterate the fact that the policy behind the passage of the workmen's compensation act was the desire to place upon the shoulders of industry the burden of paying for injuries and deaths which it caused, of compensating its workmen for disabilities which resulted from the hazards which industry created. Keeping that fact in mind, the interpretation of the definition of "injury" in the act should attach great weight to the element of causation. In other words, as was said in the *Madden* case, *supra,* one of the basic propositions which presents itself in such an interpretation is whether the disability or death is, as a matter of fact, the result of the man's disease, or whether industry was a material, real, contributing factor. The mere fact that the man happened to be engaged in performing the functions of his employment at the moment his progressive disease reached its climax, at which point any exertion, any movement, any effort would cause the diseased heart to cease its function, should not be considered as creating a situation in which compensation becomes proper. In such a case, industry is not the *cause* of the injury, but simply provides the setting for it. To impose upon

industry the risk created by progressive diseases, such as heart trouble, apoplexy, embolism, and the like, reaching their climaxes at a time while the workmen are engaged in performing their everyday functions, is to greatly out-distance the legislature's intention, and throws a far greater burden on industry than the act itself was intended to impose, if its language is to be regarded as expressive of its intent. In effect, as was stated in some of the cases quoted earlier in this dissent, the interpretation of the majority serves to make of our act an insurance system, rather than a compensation system, and to do so certainly violates the purpose of those who passed the act.

It may be that every workman injured or suffering in any manner while he is working should receive compensation or insurance therefor. However, such matters are within the province of the legislative body. In my opinion, the majority, by assuming its position, does invade that province, and goes much farther than the workmen's compensation act itself.

The judgment should be reversed.

ROBINSON, J., concurs with SIMPSON, J.