[No. 25263. Department One. December 4, 1934.]

CARRIE B. SMITH, *Respondent,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant.*[1]

*The Attorney General* and *Browder Brown, Assistant,* for appellant.

*John H. Dunbar,* for respondent.

[1]Reported in 38 P. (2d) 212.

Millard, J.—W. B. Smith, age sixty-eight years, a sufferer from chronic myocarditis, died June 21, 1933, while employed as a teamster by a firm of contractors engaged in road construction. Alleging that her husband's death was caused by the exertion incident to driving and loading and helping to unload scrapers which were used in moving earth, the widow of the deceased filed a claim with the department of labor and industries for compensation. On the ground that the death of the claimant's husband was not the result of an injury as defined by the workmen's compensation act, the claim was denied by the supervisor of the department. A hearing before the joint board on the claimant's petition resulted in affirmance of the supervisor's order rejecting the claim.

From that decision, the claimant appealed to the superior court for Thurston county, where a trial was had to the court. The cause was submitted upon the certified departmental record and the testimony of two physicians called as witnesses for the department. The court found that Smith was, for sometime prior to the date of his death, suffering from chronic inflammation of the muscles of his heart; that, while "driving and helping load and unload scrapers which were used for the purpose of moving ground," heavy work which "caused him to violently exert himself," Smith died; and

". . . that as a result of said violent exertion on the part of W. B. Smith his death occurred from heart failure . . . while in the course of his employment."

Judgment was entered, reversing the order of the department. From that judgment, the department has appealed.

The department contends that the death of claimant's husband was due to the natural progress of heart disease, for which he had been treated during

the two years immediately preceding his death. It is insisted that the burden imposed upon the respondent of proving that her husband's death was the result of injury was not sustained by her.

We agree with appellent that,

"Death is the inevitable end of life. It is normally due to natural causes. There are natural causes sufficient to produce death, and in the course of time these causes function."

It may be true, also, that, because of the weakened condition of his heart, he "might have died just the same if he hadn't been doing a thing."

That Smith was suffering from chronic heart disease, which predisposed him to such an attack as that which caused his death, and that he "might have died just the same if he hadn't been doing a thing," is immaterial upon the question of the department's liability under the workmen's compensation act. The question is whether on June 21, 1933, the death was caused by a strain arising out of the ordinary work of the deceased operating upon a condition of body which was such as to render the strain fatal. If the facts answer that question in the affirmative, claimant is entitled to compensation under the act, as the death of her husband was the result of an accident arising out of, and in the course of, his employment. We so held in *McKinnie v. Department of Labor & Industries, ante* p. 245, 37 P. (2d) 218, in which we quoted with approval the rule enunciated, as follows, in *Jones & Paton, Ltd., v. James,* English Law Reports, Appeal Cases 1933, p. 501:

"An accident arises out of a workman's employment within the meaning of s. 1 of the Workmen's Compensation Act, 1925, when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of the workman's health." (Syllabus.)

See, also, the following authorities to the same effect: *Frandila v. Department of Labor & Industries,* 137 Wash. 530, 243 Pac. 5; *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821; *Patrick v. Ham Co.,* 119 Me. 510, 111 Atl. 912, 13 A. L. R. 427; 28 R. C. L. 817; *Shadbolt v. Department of Labor & Industries,* 121 Wash. 409, 209 Pac. 683; *Schroetke v. Jackson-Church Co.,* 193 Mich. 616, 160 N. W. 383; *Brightman's Case,* 220 Mass. 17, 107 N. E. 527, L. R. A. 1916A, 321; *Baggot Co. v. Industrial Commission,* 290 Ill. 530, 125 N. E. 254, 7 A. L. R. 1611; *Guay v. Brown Co.,* 83 N. H. 392, 142 Atl. 697, 60 A. L. R. 1284; *Brown's Case,* 123 Me. 424, 123 Atl. 421, 60 A. L. R. 1293; *Texas Employers' Ass'n v. Mc-Grady,* 296 S. W. (Tex. Civ. App.) 920; *Clover, Clayton & Co. v. Hughes,* (1910) A. C. (Eng.) 242, 79 L. J. K. B. N. S. 470, 102 L. T. N. S. 340, 3 B. W. C. C. 275, 47 Scot L. R. 885. In the last case cited, the workman was suffering from an aneurism in such an advanced stage that it might have burst at any time, and it burst while he was engaged in tightening a nut, which caused a strain ordinary in his work. It was held that there was an accident within the meaning of the English workmen's compensation act.

Did the claimant sustain the burden of proving that on June 21, 1933, her husband's death was caused by a strain arising out of the ordinary work of the deceased operating upon such a weakened condition of body as to render the strain fatal? That she did, clearly appears from the facts, which are summarized as follows:

Smith, who was sixty-eight years old at the time of his death, was afflicted with, and had been receiving medical treatment therefor continuously during the two years immediately preceding his death, myocarditis. The disease was defined by the medical wit-

nesses as an inflammation of the muscles of the heart, "sometimes called rheumatism of the heart."

Smith was employed to drive a team hitched to a wheeled scraper. His duties consisted of driving the team and helping unload the scraper. The testimony before the joint board, of one of the workmen whose duty it was to unload the scrapers, was to the effect that Smith helped him in the work of unloading the scrapers, and that the unloading of the scrapers is heavy physical labor. He further testified that the scraper operated or driven by Smith had a split in the seam, was bulged down, and was the worst one on the job. There was testimony that the crew had been working in sod on the day in question, and that, where there is sod or solid earth, greater physical exertion is required of the driver of the scraper.

How many times that day Smith helped to unload scrapers before he died, is not shown. One of Smith's fellow workers testified that he could not tell how many times Smith helped unload the scraper; that Smith did not help every time, but that he helped quite a lot. This witness was the only workman who was present at the place where the scrapers were dumped. This witness was called by the claimant.

A straw boss or foreman called by the department testified before the joint board that dumping or unloading of the scraper was not a part of the job of the driver of the scraper; that a loader loaded the wheeled scraper, the driver drove the team to the dump, where there was a man to perform the work of dumping the scraper, and that the driver then drove back for another load. This witness testified that one man can dump the scraper, and that such work did not involve "any unusual or heavy strain." He further testified that he saw Smith holding a "plow team and somebody was driving his wheel team." When this

foreman told Smith to drive the plow team and plow a couple of furrows, Smith handed the lines to the foreman with the request that the foreman take the team, as he, Smith, was very sick.

"And I said, 'all right,' and I started with the team and he started over to the bank and I put the team in the pit and plowed two furrows—one down and one back—and came up opposite him. Then I handed the lines to someone else, young Rose, I think. I started down the grade to set a fill stake. I had to go around a bend. Just as I got there, Andy, one of the wheel loaders we had, said, 'Come here, there is a man dying' —or something like that, and when I got there, he was laying on the bank just where he was when I left him, with his shirt open at the neck."

There is testimony of the man who worked with Smith, helped him unload the scrapers, to the effect that Smith helped dump the last load brought down in the scraper driven by Smith.

It would appear from a careful reading of all of the testimony of all of the witnesses that, when Smith was next seen, he was holding the lines of a plow team; and when directed by the foreman was informed by Smith, "Take them, Frank, I am sick as hell." Smith then sat down on the bank of the pit and died within a few minutes following the plowing by the foreman of two furrows.

Whether Smith did any plowing following his dumping of the last load hauled by him to the dump, is very doubtful. The evidence and all reasonable inferences therefrom lead to the conclusion that, after dumping the scraper and returning to the place from whence the earth was taken, Smith then took hold of the lines of another team to do some plowing; that the strain incident to unloading the scraper had caused such illness as compelled him to surrender to the foreman the lines of the plow team ere Smith had done any plow-

ing; and that Smith went to the bank of the pit, sat down and proceeded to die. His death occurred within twenty minutes to one hour after he ceased working with the scraper. There is no testimony—no questions were asked thereon—as to whether his breathing was labored, whether he was fighting for air, coughing, or expectorating blood from the time he complained of severe illness to the moment of death.

That Smith assisted in loading and unloading a scraper loaded with dirt, is clear. That such work is heavy physical labor and required greater physical exertion on the day in question than usual, because the scraper was working in sod and the scraper was in need of repairs, and in the case of one in the physical condition of Smith constituted violent exercise, is equally clear. That immediately following, or shortly following, the dumping of a load of dirt, Smith was in pain, unable to work, and proceeded to the edge of the pit and died, is likewise clear. On that statement of facts, the physician who had been treating Smith for two years was asked: "In your opinion, the violent physical exertion Mr. Smith went through caused the heart to work faster and bring to the heart this myocarditis and caused the death?" The physician answered, "It was unable to do the work, and was paralyzed." He further testified that any violent exercise would call on the heart for extra exertion, and with a patient suffering with myocarditis, *might cause* death at any time.

Another physician, who was called at the time Smith collapsed while at work, stated in the record filed with the department that the cause of the death was "a chronic heart condition,—chronic myocarditis." In the hearing before the joint board, this physician testified as follows:

"Q. Doctor, assume that Mr. Smith had been suffering with a chronic myocarditis, and that on the morning of June 21, 1933, Mr. Smith helped load scrapers and helped unload scrapers, which necessitated that he do violent physical exertion; in your opinion, would the violent physical exertion that Mr. Smith went through that morning accelerate the action of his heart and be the approximate cause of death? A. It would be. Q. That if he was resting and at home instead of doing this violent work that day, he would not die, in your opinion? A. In my opinion, answering your hypothetical questions? Q. Yes, and the violent physical exertion would cause the heart to beat faster and bring on a condition which might result in his death, more so than if he were not doing this violent physical labor? A. That is true, it would."

One of the medical witnesses, testifying in behalf of the department in the trial before the superior court, expressed the opinion that he would look upon the death of Smith "as the natural sequence following myocarditis, because he died without any signs of over-exertion." He expressed the further opinion that, if Smith had been at home sitting in a chair, it was very possible he would have died just the same. The testimony of another physician called by the department was of the same tenor. Each of the two medical witnesses based his conclusion that the exertion had nothing to do with Smith's death on the ground that he was not fighting for air. There was testimony, however, from which only one inference can be drawn—that Smith was fighting for breath, showing signs of over-exertion—the testimony of the foreman that Smith was dying, lying on his back with his shirt open at the neck.

The case at bar is within the rule that an accident arises out of a workman's employment within the meaning of the workmen's compensation act when the required exertion producing the accident is too great

for the man undertaking the work, whatever the degree of exertion or the condition of the workman's health. *Shadbolt v. Department of Labor & Industries,* 121 Wash. 409, 209 Pac. 683; *Frandila v. Department of Labor & Industries,* 137 Wash. 530, 243 Pac. 5; *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821; *McKinnie v. Department of Labor & Industries, ante* p. 245, 37 P. (2d) 218.

Another apt authority is *Flanagan v. Ackers Whitley & Co.,* (1926) 19 B. W. C. C. (Eng.) 399. In that case, a mine employee, while working in the mine, found that a wheel of a tub had left the rail, and undertook to lift the wheel back on the rail. Thereafter, he complained of a pain in his chest and died the next day. The post-mortem showed that the heart was in a bad condition; that the walls were steadily and increasingly becoming thinner, and that death was due to the fact that the right auricle had burst. There was medical testimony to the effect that the lifting of the weight *might have caused* the condition which produced death. The court held that the evidence was sufficient to justify an award for the claimant. See, also, *McFarlane v. Hutton Bros. Stevedores,* (1926) 20 B. W. C. C. (Eng.) 222; *Johnson v. Florence Coal & Iron Co.,* (1922) W. C. & Ins. Rep. (Eng.) 69, 14 B. W. C. C. 201; *Indian Creek Coal & M. Co. v. Calvert,* 68 Ind. App. 474, 119 N. E. 519, 120 N. E. 709.

The judgment is affirmed.

BEALS, C. J., MAIN, TOLMAN, and GERAGHTY, JJ., concur.