[No. 25573. Department One. June 11, 1935.]

ETHEL MAE O'TOOLE, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.[1]

*The Attorney General* and *J. A. Kavaney, Assistant,* for appellant.

*John H. Dunbar,* for respondent.

TOLMAN, J.—The department has appealed from a judgment reversing the order of the joint board which order sustained the department in its rejection of a claim for a widow's pension under the industrial insurance act.

[1]Reported in 46 P. (2d) 388.

The cause was tried to the court sitting without a jury. The trial court made findings from which we quote:

"That the plaintiff is the widow of Thomas O'Toole, deceased, and has no children under the age of sixteen years. . . .

"That on April 2nd, 1934, while he was employed and in the course of his employment and while engaged in extra-hazardous employment as aforesaid, Thomas O'Toole, in the performance of his duties, which involved heavy manual labor, violently exerted himself and was struck on the head with a cable.

"That as a result of said violent exertion on the part of Thomas O'Toole, his death occurred from heart failure on the works of his employer and while in the course of his employment."

The department contends that there is no evidence to sustain the findings to the effect that the deceased violently exerted himself or was struck on the head by the cable, or at all, or that death was the result of either exertion or a blow.

Since the court did not find that death followed as a result of the deceased having been struck, and since we find not even a scintilla of evidence to support such a theory, that subject need not be pursued.

The deceased was engaged in the duties of tending the hook and setting chokers in a logging operation carried on by means of a donkey engine and tackle for the purpose of yarding logs. On the morning of his death, he went to work apparently in his usual health at about eight o'clock. What occurred between that time and ten o'clock, does not clearly appear. The operator of the donkey engine testified that he had seen the deceased in the morning, and presumably he did not again see him alive. The deceased was working in the woods, about two hundred yards from the donkey engine.

At about ten o'clock in the morning, after completing the loading of a truck (an operation with which the deceased could have had nothing to do), the line was by the operator of the donkey sent back into the woods. The deceased, by means of the choker, attached a load which was hauled in by the donkey. The line was again sent back by the operator of the donkey, but no signal came from the choker setter, and upon investigation his body was found lying some forty feet from the line and presumably about that distance from where he should have been at work.

Since the evidence indicates that each haul of the line (in with load and out with no load) took about two minutes, it would seem that the death occurred within some four or five minutes after the last known labor of setting the choker. The choker was a steel cable twenty-two to twenty-six feet in length and 1¼ or 1½ inches in diameter. Its weight is not indicated. It was necessary for the choker setter to handle this choker, and on this morning the deceased was handling it alone, although it seems that usually two men were employed for that purpose. Whether the employment of two men instead of one would be for the purpose of speeding operations or because of the weight of the choker, does not appear.

A thorough post-mortem examination was made by competent physicians, who testified that the cause of death was coronary sclerosis and secondary chronic myocarditis.

There is medical testimony on behalf of the respondent to the effect that, though in a serious physical condition for some time prior to his death, heavy physical labor and strain might be a contributing factor; and that, if the deceased had been at rest instead of engaged in labor on the morning referred to, his death might not have occurred at that time. The dominant

thought running through all of this testimony appears to be to the effect that the deceased might have died at any time, but that the chances in favor of death would be increased by hard labor. Or, in other words, that one afflicted as was the deceased would be more likely to die while doing heavy manual labor than he would if he remained at ease.

So far as this testimony tends to show that the death of the deceased was caused by his exertions, we think it is overcome by equally competent and far more convincing testimony to the contrary. As an example of this testimony, we quote the following from the testimony of a physician taken at the hearing before the joint board, this physician having been called on behalf of the claimant.

"Q. What was the cause of Mr. O'Toole's death? A. In looking over the body, and the various organs, the only abnormality we could find was the condition of the coronary arteries of the heart—the arteries which supply the blood to the heart. They were badly sclerosed and hardened, and they had lime plaques deposited in the walls of the arteries. That gave the arteries a very irregular appearance. It stiffened them up considerably and made them rather brittle. Q. In your opinion, Doctor, what was the cause of death? A. That is the only abnormality we could find. If I had to decide the cause of death, I would say it was due to hardening of the coronary arteries— probably a clot forming in the vessel and obstructing the vessel. Q. Is that what you physicians term arteriosclerosis? A. Yes. Q. Just describe what arteriosclerosis is. A. It is that description of the coronary arteries where the arteries have hardened and the rings of the vessel narrow, and the deposit of lime salts on the vessels, or the walls of the vessels, have occurred. Q. And the arteriosclerosis is a point in the artery where the blood pressure gets to be too much if the heart beats too fast, so that there is a breaking down of the wall? A. Sometimes it is too much. It is not necessarily so. They are soft tissues. Q. But if

there is a higher blood count and higher blood pressure in the arteries, it is more apt to break if—A. (interposing) yes. Q. (continuing)—there is no abnormal puncture through the arteries? A. Yes. Q. From your examination, and in your opinion, if he had been resting at the time, and not making any physical exertion, would this have occurred—would death occur at that time? MR. FRANKLIN: What time? MR. DUNBAR: At the time he died. Q. I said, in your opinion, Doctor, if he had been resting at the time, and by the time, I mean the time he died, and not engaging in physical exertion, would he have died? MR. FRANKLIN: The department makes the objection to the question, on the ground that he was not in physical exertion. A. Yes, I have known of cases of this sort dying in bed, or sitting in a chair. Q. But what is your opinion, as to the probability of it? A. I don't think I could answer the question. Q. In other words, suppose he were resting at home at the time he died and in the other instance he was making heavy manual labor, and then if he was resting home and doing nothing? A. I am unable to answer that question. That is a question I have never been able to decide in my own mind, just what part exertion plays in such a case. I have seen other similar cases. Mayor Mills had the same kind of a case. While he was resting in his chair at home he just simply passed away. And in my own mind I have never been able to satisfy myself, in my own mind, just how much influence exertion did have on it. Q. Well, if the condition going through the arteries, is caused by increased blood pressure, and the breaking down of the walls of the blood vessels, would you think it would be more apt to break down when he was doing heavy labor, than when he was sitting down? A. I don't think that is what happened here. I think what happened was a clot formation or block forming in the coronary artery which blocked the arteries. In other words, it was a coronary embolus. Q. Then you don't think the physical exertion had anything to do with it? A. Not much. Q. What is your honest judgment on it? A. As I say, I have never been able to make up my mind on how much exertion had to do with it. Q. Then you think a man sitting at home in his chair is just as

much likely to have it as a man engaged in heavy exertion, as Mr. O'Toole was engaged in? In this case? A. I know he could. Q. What is your opinion, Doctor? I don't want to cross examine my own witness. Of course he could. A. I don't really know how to answer your question. I don't know that exertion would have any increased risk. Q. Supposing I had some heart trouble and I was out doing heavy manual labor, and I died from arteriosclerosis. Do you think the exertion would make me die quicker than if I sat here in my chair? A. There are dozens of different kinds of heart diseases. But in the coronary sclerosis I don't think it would make any difference. Q. Do you think he would die just as quickly sitting in his chair as he would if he were out doing heavy manual, violent, labor? A. Yes, I think he might have. Q. What would you say as to the probability whether or not he would if he were in violent labor or sitting at home in his chair? A. I am unable to see why exertion would make any difference in the formation of a clot. That is the difference I am trying to make. In this case the artery blood may clot just as easily if the patient is quiet as if he were under exertion.''

Taking the medical testimony as a whole, it does not, in its effect, differ greatly from that which we have quoted. At the most, it indicates a bare possibility that severe and strenuous exertions might have induced death at the time, but it falls far short of establishing either that there was severe exertion at the time or, if so, that such exertion caused the death.

█ We find from the whole record no convincing proof which will support the findings of fact as to the cause of death which we have quoted. It is true that the record shows that the work of a choker setter is hard physical labor. If deceased in the earlier morning hours had been so engaged, he afterwards had a resting spell while the truck was being loaded just before the time of his death. After that resting spell, he had set the choker but once. There is nothing to indi-

cate that there was anything violent and strenuous about his exertion in so doing, and even though it be presumed that he labored heavily in that last setting of the choker, still the evidence as a whole does not indicate that such exertion was the proximate cause or even contributed to the death which followed within a few minutes thereafter.

Respondent relies upon *Metcalf v. Department of Labor and Industries,* 168 Wash. 305, 11 P. (2d) 821; *Smith v. Department of Labor and Industries,* 179 Wash. 501, 38 P. (2d) 212; and *Rikstad v. Department of Labor and Industries,* 180 Wash. 591, 41 P. (2d) 391. In the *Metcalf* case, there was positive evidence of unusual exertion and that death resulted therefrom immediately. In the *Smith* case, we held that the proof was sufficient to establish that the death was caused by the physical exertions required by the work. In the *Rikstad* case, we held that the proofs, supplemented by an allowance by the joint board for time loss, were sufficient to overcome certain evidence with reference to preexisting disease. None of these cases is at all in point here, and none undertakes to deny the rule that one seeking to recover must assume the burden of establishing the necessary facts.

The department cites cases from many jurisdictions, and from this court the cases of *Kavaja v. Department of Labor and Industries,* 126 Wash. 284, 218 Pac. 196; *Zoff v. Department of Labor and Industries,* 174 Wash. 585, 25 P. (2d) 972, and *Mecartea v. Department of Labor and Industries,* 176 Wash. 27, 28 P. (2d) 257. These cases recognize that the burden of proof is on the claimant, and that conjecture cannot take the place of proof. They also recognize the statutory rule to the effect that the decision of the department is *prima facie* correct and will not be reversed until its *prima facie* correctness has been overcome by

the proof. In the language of Judge Mitchell in the last cited case:

"Trying the case in that manner in this court and upon consideration of all the evidence as submitted by the statement of facts, our conclusion and decision is that the *prima facie* correctness of the decision of the joint board has not been overcome.

"Reversed and remanded, with directions to the superior court to enter judgment confirming and approving the order of the joint board."

We adopt that language and apply it here. The judgment is accordingly reversed.

MAIN, BEALS, and GERAGHTY, JJ., concur.

MILLARD, C. J. (dissenting)—I am convinced by my examination of the record that respondent sustained the burden of proof. Therefore, I dissent.