[No. 28755. Department Two. December 4, 1942.]

GUY F. ATKINSON COMPANY, *Respondent,* v. HAZEL WEBBER *et al., Appellants.*[1]

'Reported in 131 P. (2d) 421.

**580**

L. B. *Sulgrove,* for appellant Hazel Webber.

The *Attorney General, Edward S. Franklin,* and *Roy A. Huse, Assistants,* for appellant Department of Labor & Industries.

*Chadwick, Chadwick & Mills,* for respondent.

*Grosscup, Morrow & Ambler, amici curiae.*

BEALS, J.—Robert Webber, husband of Hazel Webber, died as the result of a coronary thrombosis October 11, 1940, while working for Guy F. Atkinson Company, a corporation. He was forty-two years of age, and was working for the company as a caterpillar tractor (or "bulldozer") driver on the construction known as the Mud Mountain dam. He was on the night shift from twelve midnight to eight a. m. He went to work at midnight, October 10th, and about seven-thirty o'clock on the morning of October 11th, a fellow employee observed him lying on the ground near his tractor, evidently suffering severely. He was assisted to a nearby automobile and taken to the employer's camp hospital, where he died in a few minutes.

December 16, 1940, Hazel Webber, the workman's widow, filed with the department her claim for a pension, and in due time the supervisor allowed the claim, charging against the employer's cost experience the amount of four thousand five hundred dollars. From this award, the company appealed to the joint board, which, October 27, 1941, sustained the order of the supervisor. From this order the company ap-

pealed to the superior court, where the action was tried, with the result that findings of fact, conclusions of law, and judgment were entered reversing the order of the joint board, from which judgment the department of labor and industries and Hazel Webber, the widow of the deceased workman, have prosecuted separate appeals to this court.

The department assigns error upon the entry of one finding of fact and several conclusions of law; upon the allowance to respondent (the employer) of an amount as attorney's fee, to be paid out of the administrative fund of the department; and upon the allowance of certain witness fees to respondent.

Appellant Hazel Webber on this appeal finds herself in a rather peculiar position. The department allowed her claim, which is, of course, the matter of primary concern to her. Whether or not the department charges to respondent a certain sum by way of cost experience is to appellant Hazel Webber immaterial. In her brief, Mrs. Webber states that she does not understand that the superior court intended its judgment to go farther than to reverse the decision of the joint board charging a certain amount as cost experience to respondent. The judgment which the superior court entered reversed without qualification

". . . the orders of the supervisor of industrial insurance and of the joint board sustaining the same in connection with the death of Robert Webber, and finding his death to have been the result of an industrial injury,"

while in the employ of respondent. The superior court remanded the cause to the department for the purpose of complying with the court's findings and judgment. By its appeal to the superior court, respondent brought before that court for review the decision of the joint

board affirming the supervisor's action upon Mrs. Webber's claim, respondent appealing "from each and every ruling made in connection therewith."

In view of our conclusion upon the merits of the controversy, this matter need not be further noted.

The deceased, Robert Webber, was a thoroughly competent bulldozer operator, and May 7, 1940, entered the employment of MacDonald Building Company, which was placing a fill on the state capitol grounds, at Olympia, preparatory to the erection of the structure now known as the Transportation building. On the date mentioned, Webber's machine, while he was operating the same, was caught in an earth slide and carried about twenty-five feet down an incline. The bulldozer was turned upside down, Webber being caught underneath, none of the weight of the bulldozer, however, resting upon him. He was rescued by fellow workmen and taken in an ambulance to the hospital. While caught under the bulldozer, Webber was in serious danger of suffocation, he having been thrown face downward in loose sand. The doctor who treated Webber made no X-ray examination of his chest or lungs, but advised Webber to remain in the hospital at least overnight. It appears, however, that, notwithstanding this advice, Webber went to his home in Tacoma. At a later date, Webber called at the doctor's office, but the doctor did not see him. The doctor testified that, in the course of his examination of Webber, he observed no heart enlargement or murmurs. His examination of the heart was by stethoscope only, and it appears that bad heart conditions may exist which would not be disclosed by that method of examination.

Dr. W. B. McNerthney, a Tacoma physician of many years' experience, was called to the Webber home either on the night of the accident or the evening of

the following day, Webber complaining of soreness of his chest and nervousness, stating that he had been buried in dirt. Another stethoscopic examination of the heart was negative. The doctor ordered the patient to stay in bed to rest, and gave him some medicine for his nervous condition. The next day the doctor found the patient improved, and about ten days later examined Webber at his office, finding no symptoms of heart injury or any other difficulty.

Mrs. Webber testified that, after her husband was injured by the earth slip, he remained home for about a week, and never resumed employment with the MacDonald Building Company; that he complained of pain, sometimes in his chest and sometimes in his stomach. Whether Mr. Webber was employed after the accident referred to and until he entered the employ of respondent, July 27, 1940, is uncertain. He was regularly employed by respondent from the date last mentioned until his death, and worked regularly until the evening of October 9th. On that evening, Webber advised his employer that he would be unable to take his shift that night. Concerning this matter, Mrs. Webber testified that, about one o'clock in the morning of that day, Webber went to the kitchen for a drink of water, and fell face down upon the floor. A doctor was procured three or four hours later, he testifying that in his opinion Webber had suffered a coronary attack, either a spasm or occlusion. The doctor advised Webber not to return to work, and instructed him to consult a physician before attempting to work again. Notwithstanding this, Webber reported for work, and as above stated, died on the morning of October 11th.

Mrs. Webber stated that, during the period he worked for respondent, her husband had often complained of pain in his chest and his stomach, and that,

from the time of the accident, while he was working for the MacDonald Company, to his death, sand sometimes appeared in his saliva.

During the night of October 10th-11th, Webber was operating his tractor in keeping dirt in proper quantities in front of a shovel, and in keeping level a dirt road or path which was being used by trucks. It does not appear that the work was particularly heavy, or that management of the very large tractor required any great exertion on Webber's part. Sometimes the tractor would have no particular duty to perform, when Webber would stop by the roadside to await some occasion to start the machine again. The shift would end at eight o'clock a. m., and between seven-fifteen and seven-thirty, Webber was discovered lying on the ground, in great distress, by George Potvin, a fellow employee, the tractor not having been in operation for about fifteen minutes. Webber was in very bad condition, Potvin and another workman summoned to help him anticipating that he might die then and there. Artificial respiration revived him to some extent, after which, a witness stated, he made a remark to the effect that there was "one more grease cup on his cat that we haven't got."

No one observed Webber at the time of his collapse, and he had not advised his employer or anyone else that he had suffered a shock a day or so before, and that his doctor had advised him not to go to work. A post-mortem performed by Dr. Gale E. Wilson disclosed an enlarged heart and "a fresh clot in the descending branch with a fresh hemorrhagic infarct in the posterior left ventricular wall." Dr. Wilson stated his diagnosis as follows:

"Coronary sclerosis
"Coronary occlusion
"Infarcts left ventricle

"Infarcts kidney

"Chronic passive congestion, liver, spleen & kidneys."

Another doctor, who was taken by Dr. Wilson to the autopsy room and examined the body of the deceased, confirmed Dr. Wilson's report.

It was and is respondent's contention that Webber's death was the result of the condition of his heart, dis-associated from any trauma, there being no evidence of any serious external injury. It is argued that Webber's physical condition, without exertion of any sort, was sufficient to cause his death, and that Webber's days were numbered, whether he worked or not.

Some of the medical evidence in the record tends to show that the injury which Webber suffered while in the employ of the MacDonald Building Company had nothing whatever to do with Webber's death; other evidence indicates that that accident probably rendered his preexisting bad heart worse.

This appeal is before this court *de novo,* and the burden of overcoming the *prima facie* presumption that the joint board ruled correctly in allowing the claim rests upon respondent. *Mecartea v. Department of Labor & Industries,* 176 Wash. 27, 28 P. (2d) 257; *McLaren v. Department of Labor & Industries,* 6 Wn. (2d) 164, 107 P. (2d) 230.

It clearly appears from the record that, for some time prior to his death, Mr. Webber had suffered from a very bad heart condition, which had probably existed for about two years. How much, if any, the accident of May 7, 1940, aggravated this condition, is uncertain. The record does not preponderate against the opinion of the supervisor and the joint board, to the effect that the death of Mr. Webber cannot be directly attributed to that accident. Doubtless his heart was in a very bad condition at that time, but to what de-

gree, if any, that accident rendered that heart condition worse or hastened his death, cannot be determined. All the medical testimony is to the effect that Mr. Webber might have died from heart disease at any time, and that his death actually resulted from the fresh blood clot, or thrombosis, in the coronary artery, disclosed by the autopsy.

The caterpillar tractor or bulldozer which Mr. Webber was operating was of the largest and heaviest type used on the Mud Mountain dam construction. It was equipped in front with a steel blade for the purpose of pushing earth and debris in front of the tractor. The machine moves on wide steel treads, and is operated by a series of hand levers. Webber was operating the bulldozer over somewhat rough and uneven ground, and in so doing he was sometimes subjected to jolts and jars. All of the doctors who testified, with one exception, stated that a coronary thrombosis such as that which caused the death of Mr. Webber might have been brought about by exertion. One doctor testified that a very slight exertion might precipitate a condition which would cause death. Of course, it is easy, after the event, to say that Mr. Webber was in no condition to work, but he did work, and received his death stroke while on his job.

During the past few years, many similar questions have been considered by this court. *McKinnie v. Department of Labor & Industries*, 179 Wash. 245, 37 P. (2d) 218; *Devlin v. Department of Labor & Industries*, 194 Wash. 549, 78 P. (2d) 952; *Bergagna v. Department of Labor & Industries*, 199 Wash. 263, 91 P. (2d) 551; *Barnes v. Department of Labor & Industries*, 6 Wn. (2d) 155, 106 P. (2d) 1069. These cases are all considered and discussed in the case of *McCormick Lbr. Co. v. Department of Labor & Industries*, 7 Wn.

(2d) 40, 108 P. (2d) 807, and the rule laid down by the majority of the court in the earlier cases was adopted.

In the recent case of *Northwest Metal Products Co. v. Department of Labor & Industries,* 12 Wn. (2d) 155, 120 P. (2d) 855, the matter was again considered, and the rule laid down in the *McCormick* case unanimously followed. The recent case of *Guiles v. Department of Labor & Industries,* 13 Wn. (2d) 605, 126 P. (2d) 195, cited by respondent, is not here controlling.

The trial court, in reversing the departmental order, was influenced by the opinion of this court in *O'Toole v. Department of Labor & Industries,* 182 Wash. 202, 46 P. (2d) 388. So long as the law remains unchanged, the *McCormick* and *Northwest Metal Products Co.* cases should be followed. In future, the *O'Toole* case should be considered in the light of the statement just made.

Respondent calls attention to the fact that, when appellant Hazel Webber filed her claim with the department, she stated that her husband died as the result of an industrial injury, describing in her claim, and apparently primarily basing the same upon, an injury which her husband suffered May 7, 1940, while in the employ of the MacDonald Company, this referring to the accident occasioned by the slide above described. Mrs. Webber referred to this accident apparently as the only occasion of which she was advised which resulted in any trauma suffered by her husband while working, although she stated in her claim that, at the time of his death, it was observed that her husband's forehead showed a slight abrasion. There was testimony to the effect that this abrasion was not recently received.

Respondent argues from the record that Mr. Webber's work while in respondent's employ was light,

and would result in a minimum of shock or vibration. It is also argued that, in view of the record, it cannot be held that any exertion on Mr. Webber's part caused his death; that he died from a heart condition of long standing, and not from any particular recent injury. Respondent quotes from the testimony of its camp surgeon, who arrived at the camp hospital just as Mr. Webber expired. This physician testified in part as follows:

"The man did not have to go to work to have had the same thing happen. He could have had that thing any time from the time he left his house on the way going to work, to the time that he got to the job without even getting on the 'cat'. The same thing could have happened. Q. Then you mean his death was a foregone conclusion, without any kind of exertion, is that what I take it? A. That's what my conclusion is, very definitely."

In view of all the testimony, there can be no doubt that Mr. Webber had a bad heart condition, and that his death might have occurred at any time. However, he did die while working for respondent and engaged in operating a heavy bulldozer, which, however such work might be described, must have involved considerable physical exertion, and which undoubtedly at times resulted in jars and shocks of some degree of violence.

Respondent contends that Mr. Webber did not collapse while seated on the bulldozer. Whether or not this is true, we do not know. He was found on the ground a short distance from the machine. Unless he was thrown from the machine by some violence, it seems probable that he left his seat thereon because of some physical disturbance. In any event, this question is of little importance. It is true that there is no testimony to the effect that Mr. Webber particularly

exerted himself for a few minutes prior to the time he was discovered lying on the ground *in extremis.*

The department determined the question presented in favor of appellant Hazel Webber, and allowed her claim for a pension. Upon the record before us, we hold that this case falls within the principle of the *McCormick* and *Northwest Metal Products Co.* cases, *supra,* and that the trial court erred in reversing the order of the department allowing Mrs. Webber a pension.

Respondent contends that, under the circumstances shown, it should not be charged with any cost experience based upon Mr. Webber's death, arguing that his death was not the result of any accident, as none occurred. In this connection, respondent also argues that Mr. Webber undoubtedly suffered a severe accident while in the employ of the MacDonald Company, which accident was duly reported to the department, and that, as the record contains testimony to the effect that Mr. Webber's physical condition after that accident was worse, and that he complained of pain and spit sand, if it be held that appellant Hazel Webber is entitled to a pension, respondent should not suffer through any charge against its cost experience. In this connection, respondent cites the opinion of the supreme court of Oregon in the case of *Chalfant v. Arens,* 167 Ore. 649, 120 P. (2d) 219.

It may well be that the accident of May 7, 1940, resulted in some deterioration of Mr. Webber's physical condition, but that is a matter of speculation only.

The record before us affords no basis for holding that respondent's cost experience may not, under the law, be charged with the amount which the department set against the same.

The conclusion which we have reached on the merits renders it unnecessary to consider other as-

signments of error argued by appellant department.

The judgment appealed from is reversed, with instructions to the superior court to affirm the order of the department, from which respondent appealed to the superior court.

MILLARD, STEINERT, and JEFFERS, JJ., concur.

ROBINSON, C. J. (concurring in the result)—No other result can be arrived at, unless the court abandons the erroneous rule of decision employed in the *McKinnie, Devlin, Bergagna, Barnes, McCormick Lbr. Co.,* and *Northwest Metal Products Co.* cases, cited in the foregoing opinion, and some others not cited, such as *Frandila v. Department of Labor and Industries,* 137 Wash. 530, 243 Pac. 5, in which case the error originated.

The opinion describes at some length an accident in which Webber and his bulldozer rolled down a bank while he was in the employ of the MacDonald Building Company. I take it, however, that the recovery granted the appellant widow is in no way predicated upon that happening, since later in the opinion the department's action in charging the award against the cost experience of the respondent Atkinson Company is approved.

The error in the instant case, as in most, if not all, of those it cites as precedents, is simply this: Recovery is allowed, although there is no evidence of "a sudden and tangible happening, of a traumatic nature, . . . occurring from without, . . ." It so happens that, in this case, the necessity of such evidence to warrant recovery is greatly emphasized by a fact thus stated in the opinion:

"All the medical testimony is to the effect that Mr. Webber might have died from heart disease at any time, and that his death actually resulted from the fresh blood clot, or thrombosis, in the coronary artery, disclosed by the autopsy."

This is reiterated later in the opinion:

"In view of all the testimony, there can be no doubt that Mr. Webber had a bad heart condition, and that his death might have occurred at any time."

The result of the opinion is, nevertheless, justified by the many precedents cited in its support. To overrule such an array of decisions, uniform over a period of sixteen years, is too much to be expected of any court. If the error is to be corrected, it must be done by the legislature. If it attempts to do so, it will find it somewhat difficult to unmistakably indicate its purpose. As pointed out by Simpson, J., in his dissenting opinion in the *McCormick Lbr. Co.* case, at 7 Wn. (2d), pages 62, 63, the 1927 legislature attempted to avoid the effect of the holding in the *Frandila* case by amending the definition of "injury" to read as follows:

"The word 'injury' as used in this act means *a* sudden and *tangible happening, of a traumatic nature,* producing an immediate or prompt result, and *occurring from without,* and such physical condition as results therefrom." (Italics mine.)

This definition, as formulated in 1927 was reenacted in 1929, and has ever since remained a part of the workmen's compensation act. Rem. Rev. Stat. § 7675 [P. C. § 3470]. If it does not, as it now reads, exclude deaths by collapse, of persons liable to drop dead at any moment due to a long standing and progressive disease of the heart, unless and until it be established that such collapse was the immediate and prompt result of some "sudden and tangible happening, of a traumatic nature, . . . occurring from without, . . ." it would seem difficult to formulate a definition that will.

ON REHEARING.

[*En Banc.* May 22, 1943.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein.

GRADY, J. (concurring)—I would add nothing to this *per curiam* opinion had I been a member of the court during the time the doctrine of the cases cited and followed in the opinion was being developed. I would not have been in accord with the application of Rem. Rev. Stat., § 7675 [P. C. § 3470], defining "injury," to the facts of those cases. But, as a substantial majority of the members of the court are either in accord therewith or feel that the court is committed thereto, and that any change must now be made by the legislature, it will serve no useful purpose for me to voice my dissent. There must come a time when a rule of law shall be deemed settled and the rule of *stare decisis* followed, and, for these specific reasons, I concur in what has been said by Judge Robinson in his concurring opinion.

MALLERY, J., concurs with GRADY, J.

SIMPSON, C. J. (dissenting)—I dissent upon the following grounds: (1) The evidence produced at the so-called joint board hearing was not sufficient upon which to base the order granting the pension and charging the employer with cost experience, but did, on the other hand, clearly demonstrate that Mr. Webber's death was not the result of a "sudden and tangible happening of a traumatic nature"; (2) that the department's conclusion is arbitrary and capricious and was based upon a theory which is fundamentally wrong, and that its order should not be accorded a presumption that it was correct; and (3) that the interpretation of the word "injury" is incorrect.

Mr. Webber's work, as shown by the following excerpts from the evidence, was not of a strenuous nature. Mr. Aker, who was in charge of the hiring of truck drivers and "cat skinners," testified:

"A. Well, he was operating a dozer around a shovel. A gas shovel that was moving dirt. It was his job to keep the roads level, and the material pushed up in front of the shovel, so that the shovel could pick the dirt up. Q. In the realm of bull-dozer operations, was that work, in your opinion, light or heavy work? A. Very light, very light. . . . Q. And just what did his work require him to do between July 27th and October 9th or 10th? A. Well, he was, he was on the same 'cat' and the same job pretty nearly all that, in fact I think he was on the same 'cat' and the same job all that time. We were on, we were moving some dirt to build a haul road from our main quarry into the dam, and his work was keeping the road level for the trucks to haul over, away from this shovel. And just kept the dirt pushed up in front of the shovel so that the shovel could pick up the dirt. Q. And what is he required to do in that type of work as an operator of a 'cat' or a dozer. Just what does he do, just sit on the 'cat'? A. He stays on the 'cat,' yes. He stays on the 'cat,' and if the road gets cut-up, it's quite rainy out there, and if the road gets cut up, why he takes the 'cat' then, and makes the trip up and back on this road, in these ruts, and smooths them out, and then if there's no trouble, why then he goes back and pushes the dirt up then to the front of the shovel again, and then if he's not doing much, he pulls up to the side of the road and waits there for someone, some foreman to tell him for some other work to do, if he wants, and just waits, maybe at times he's moving—there's just, he might move the 'cat' from the shovel to the dump, and then smooth the dump off. Q. Was there ever any heavy manual work in connection with that? A. No, no. Q. None whatsoever, is that correct? A. That's right. Q. How much difference is there in driving a caterpillar as compared to driving an automobile or compared as to driving the average truck? A. Well, personally I

would say that, considering the size of the trucks we have out there, I'd say they're much harder to operate than a 'cat.' . . . By Mr. Chadwick: Q. This specific work that he was on, though, was being done in soft dirt? A. Yes, it was, it was all soft dirt, there was no rock and it was on a level road most of the time where he was at that time. Q. And then in the operation of the 'cat' referred to, there would be a minimum of jarring in this particular work that he was involved in, wouldn't that be true? A. That's right."

George D. Potvin, excavating foreman, stated:

"Q. In your opinion, would you describe that in the class of caterpillar work as heavy or light work? A. Oh, it was very light work."

As I view the evidence, there was nothing to prove that Mr. Webber exerted any definite physical effort on the day of his death. The order was founded upon conjecture, which cannot be the basis of an allowance of a claim. *Sheppard v. Department of Labor & Industries*, 191 Wash. 80, 70 P. (2d) 792; *Schafer Bros. Logging Co. v. Department of Labor & Industries*, 4 Wn. (2d) 720, 104 P. (2d) 747; *Cooper v. Department of Labor & Industries*, 11 Wn. (2d) 248, 118 P. (2d) 942.

In cases of this nature, the actual facts must be obtained from medical men. *Stevich v. Department of Labor & Industries*, 182 Wash. 401, 47 P. (2d) 32; *Cooper v. Department of Labor & Industries*, 195 Wash. 315, 80 P. (2d) 830; *Eyer v. Department of Labor & Industries*, 1 Wn. (2d) 553, 96 P. (2d) 1115; *LaLone v. Department of Labor & Industries*, 3 Wn. (2d) 191, 100 P. (2d) 26; *Weinheimer v. Department of Labor & Industries*, 8 Wn. (2d) 14, 111 P. (2d) 221; *Radich v. Department of Labor & Industries*, 10 Wn. (2d) 107, 115 P. (2d) 1022.

The record discloses the doctors' evidence as follows: Dr. Havlina testified that Mr. Webber, on the night before the day of the death, had a coronary attack—

"Either a spasm or a clot in one of his coronary arteries in the heart." He was thereafter asked the question:

"Q. Well, from your examination of him on October 9th, and his death on October 11th, would you say that the attack of October the 9th, was the start of the chain of events leading to his death?"

He stated:

"A. The cause of death was probably a similar attack like the one on October the 9th, which was undoubtedly, was just an attack, similar to the one on October 9th. If one were going to say that the one on October 9th, were the cause of it, this man never could have walked around, undoubtedly, and stood it. Although. I feel that he probably had a spasm or a beginning of this situation, his clots were probably immediate, because when a clot fills the blood vessel, death usually occurs if it is a large blood vessel, within just a few minutes. . . . Q. . . . . Doctor, what effect would exertion have upon a man in the condition that Mr. Webber was in, when you saw him on October 9th, 1940? A. That is impossible to say because a man may, with a spasm, go right ahead with a little rest and be able to carry on. The average individual, that is, like Mr. Webber, was conscientious in his work, might go back to work and get away with it. Q. Well, as you say, you were not able to determine from the examination which you made on October the 9th, whether this was just what you doctors call a spasm of the blood vessel or whether a clot had already started to form? A. That's right. Q. In the blood vessel? A. That's right. Q. Is that correct. And well, after talking to Dr. Wilson about the case, are you in any better position now to say whether there was a clot there or just a spasm when you saw him on October the 9th? A. I felt that since the man had survived and become a, began feeling better and stirring around, that it probably was just a spasm on October 9th. Q. And, Doctor, do you ascribe to the theory that exertion in a person's work, can produce a blood clot in the coronary artery, which will result in death? A. Yes. Q. And is there any degree of exertion necessary, Doctor, to produce a

clot in the coronary artery that precipitates death? A. That, of course, is a matter of degree. Some men might be able to stand a lot of exertion and have nothing happen, now, and another man might again have such a thing happen with not so much. Usually it is quite a little exertion as I believe it, if that is the thing that causes it. It isn't the only thing that causes it. Q. Well, do you personally know what other things besides exertion may cause a clot in a coronary artery that would precipitate death? A. Infection in the cardiac region. With clots, or with particles of, of as we call, scar on the valve, that might let loose as emboli. Q. Well, there weren't any emboli in this case, though. A. No. Q. So far as that type of infection, that would be ruled out in this case from the autopsy examination? A. Yes. Q. And anything else — is there anything else that might produce a clot, other than exertion? A. I don't know of anything then, no."

Dr. Nickson, resident pathologist of the Swedish hospital in the city of Seattle, stated, in answer to hypothetical questions which included the history of the deceased:

"Q. Would it be your opinion upon the history as detailed to you that this man was a victim of a progressive disease which might have caused his death at any time or on any occasion with or without accompanied exertion? A. It is clearly shown so by both the post mortem record and by the preceding history which you read. This man on a night, of October 8th, if I'm not mistaken had his initial infarction, which is shown in the heart at the time of the post. At that time, he was at rest in bed. He had gotten up only to go to the bathroom, which is not considered muscular exertion of any considerable quantity. . . . Q. And then, Doctor, your opinion in this case, predicated upon his death on *October 10th, 1940;* was that in your opinion, the exertion that he had been engaged in, in carrying on his work as a 'cat' bull-dozer operator on that particular date, would not cause or precipitate this coronary thrombus from which he died? A. I don't think that the exertion that he was undergoing at that

time had anything to do with the precipitation of his coronary thrombosis. . . . Q. It is your opinion, is it not, Doctor, that wherever this man might be, or whatever he might have been doing, with the condition of heart as found by Dr. Wilson's post mortem; death was going to catch up with him very shortly? A. Very shortly, yes sir. This is a progressive thing as illustrated by the post mortem findings, and sooner or later he was either going to wake up dead, or he was going to topple over, wherever he might have been, whether he was at work or not. Q. It wouldn't be a case of exertion at all. It would just be nature taking its due course? A. Just taking its toll, yes sir."

I am unable to conclude from the expert testimony that Mr. Webber's death was caused by any physical exertion which can be traced to his activities in driving the "cat."

The facts in this case are quite similar to those in *O'Toole v. Department of Labor & Industries*, 182 Wash. 202, 46 P. (2d) 388. In that case, a workman was engaged as a hook tender. He died suddenly of a heart ailment while alone in the woods a short time after he had attached a load by means of a heavy choker. The medical testimony introduced on behalf of the claimant indicated that the heavy physical labor and strain attendant upon his work might have been a contributing factor, and that, if he had not been working, his death might not have occurred. In passing upon that case, this court said:

"At the most, it indicates a bare possibility that severe and strenuous exertions might have induced death at the time, but it falls far short of establishing either that there was severe exertion at the time or, if so, that such exertion caused the death."

The order of the supervisor reads as follows:

"WHEREAS, A complete investigation of the full circumstances surrounding the injury of May 7, 1940,

indicate that the claimant did not sustain any disability and after examinations by several doctors no disability was demonstrated either as to his heart or any other part of his anatomy, it is therefore indicated that death was not the result of this injury. Further investigation, however, of the work record of the deceased while in the employ of the Guy F. Atkinson Company at Mud Mountain Dam indicates that his work was of a strenuous nature and that he had to cease working on October 9, 1940 and was treated for a heart condition but later returned to work on the night of October 10, 1940 and about the end of this shift, namely 7:30 A. M., the deceased collapsed on the 'cat' which he was operating, and died, and, taking into consideration several Supreme Court decisions of the State of Washington, it must be conceded that death was the result of aggravation of an existing heart condition due to strenuous employment."

This order in stating that the deceased collapsed on the "cat" which he was operating, was entirely incorrect, for the undisputed evidence shows that, when Mr. Webber was found, he was lying on the ground a short distance from the "cat" and had not operated the machine for about fifteen minutes. The summary of record and proceedings made by the joint board stated:

"The deceased workman here was a cat driver employed at Mud Mountain Dam. His duties were to operate the cat with a bulldozer to level the road and while at work at about 7:30 A. M. *he was found in a semi-conscious condition seated in the driver's place on the cat.* He was picked up from the seat of the cat and moved in a truck to the hospital where he died. The widow filed a claim for pension and same allowed. On Notice awarding the pension, the employer, Guy F. Atkinson Co., appealed contending that claimant's death was not the result of an injury while employed by them. Testimony has been presented. Inferences are made that claimant's heart trouble and death may have been due to another injury while claimant was employed by MacDonald Bldg. Co. at which time the

deceased workman was employed by the MacDonald Bldg. Co. operating a cat on the Capitol grounds when an earth slide resulted in the cat going over the hill with the driver. The hearing is complete and all testimony has been transcribed.

"Subsequent to the granting of the petitioner's application for rehearing, the employer being the petitioner in this case and protesting the allowance of this claim and the charging of the cost against the employer, Guy F. Atkinson, the matter came on regularly for hearing and testimony has been presented and transcribed.

"After a review of the entire record and file the Board concludes that there is no evidence that would warrant a disturbance of the finding of the Supervisor of Industrial Insurance and the order of January 8th and January 9, 1941.

"The Supervisor is sustained. The orders of January 8th and January 9, 1941, are hereby affirmed." (Italics mine.)

The order dated October 27, 1941, was as follows:

"On this date, the complete record of the above claim being presented to the Joint Board in Executive Session and the Joint Board having carefully and thoroughly considered such record together with all evidence offered in the matter, and you being hereby notified, now:

"IT IS HEREBY ORDERED THAT the Supervisor's action be and hereby is sustained."

The order of the joint board bears the printed names of the members of that board, but was only signed by its secretary.

It will be noted that there was no finding by the supervisor or the joint board which took into consideration the evidence given by the doctors. But, in the face of that testimony, they allowed the claim. The supervisor and the board based their order not upon the evidence introduced, but upon several unnamed court decisions. That basis was fundamentally wrong.

The statute, Rem. Rev. Stat., § 7697 [P. C. § 3488], states that:

"... In all court proceedings under or pursuant to this act the decision of the department shall be prima facie correct and the burden of proof shall be upon the party attacking the same. ..."

On the rehearing, the testimony was taken on several occasions, none of which was attended by a member of the joint board. That board did not have the advantage of seeing or hearing the witnesses under oath, but all of the testimony was taken by one spoken of as an examiner, who reported the testimony to the joint board. This seems to have been the practice of the department for many years.

We have passed upon a like situation in the following cases: *Cheney v. Department of Labor & Industries,* 175 Wash. 60, 26 P. (2d) 393; *Peterson v. Department of Labor & Industries,* 178 Wash. 15, 33 P. (2d) 650; *Church v. Department of Labor & Industries,* 179 Wash. 443, 38 P. (2d) 234; *Dry v. Department of Labor & Industries,* 180 Wash. 92, 39 P. (2d) 609; *Rikstad v. Department of Labor & Industries,* 180 Wash. 591, 41 P. (2d) 391; *Zankich v. Department of Labor & Industries,* 189 Wash. 25, 63 P. (2d) 427; *Matson v. Department of Labor & Industries,* 198 Wash. 507, 88 P. (2d) 825; *Barnes v. Department of Labor & Industries,* 6 Wn. (2d) 155, 106 P. (2d) 1069.

In speaking of the presumption, Judge Main stated in the *Cheney* case:

"It is said that the joint board was justified in disregarding the testimony of the father and son, and that, since the decision of the board is *prima facie* correct and the burden is upon the one attacking it to overcome that decision by evidence, the judgment of the superior court should be reversed and the order of the joint board sustained. The members of the joint board were in no better position to weigh and consider the

testimony than was the superior court or than are we. They did not hear the witnesses testify, and received their impressions from a transcript of the testimony. Obviously, the statute (Rem. Rev. Stat., § 7697), which provides that the 'decision of the department shall be *prima facie* correct,' although to be kept in mind, cannot have the same presumptive effect when the testimony is taken before an examiner and a transcript thereof submitted to the board, as where it is taken before one or more members of the board. After reading and considering the testimony in this case, we see no reason why it should be disregarded or disbelieved."

We modified this rule in the *Church* case by stating:

"In the case at bar, the evidence passed on by the joint board was taken before an examiner, and appellant invites us to reconsider the rule which we laid down in *Cheney v. Department of Labor & Industries*, 175 Wash. 60, 26 P. (2d) 393, as applicable in such cases. While it is true that the *prima facie* presumption applies to an order of the joint board whether the same be based upon a hearing before the board or upon evidence taken before an examiner, it is only reasonable that, on judicial review, an order has somewhat more weight when considered in connection with a case in which the joint board actually saw and heard the witnesses. The rule laid down in the *Cheney* case goes no further than this, and we see no occasion for modifying the doctrine therein promulgated."

In the last *(Barnes)* case cited, this court held:

"It is true, as appellant points out, that the presumption has less force and effect where, as in the present case, the joint board did not have the witnesses before it, but had only transcripts of their testimony taken before examiners. [Citing cases]

"This circumstance, however, affects the weight of the presumption rather than its validity. The statute which created it does not make any exception. The presumption has been recognized and applied where all the witnesses testified before examiners and none of the testimony was taken before the joint board."

In the present case, the presumption should be accorded little, if any, weight. In considering the case *de novo,* we are in a position equal to that of the joint board, because they decided the case upon the record and did not have the advantage of seeing or hearing the witnesses testify, a situation which is always the basis of according a presumption of correctness to the conclusions reached by triers of fact. I cannot escape the conclusion based upon the testimony that the claimant failed to prove that her husband died as a result of an injury received while engaged in his work of operating the "cat."

I adhere to my dissents in the cases of *Bergagna v. Department of Labor & Industries,* 199 Wash. 263, 91 P. (2d) 551, and *McCormick Lbr. Co. v. Department of Labor & Industries,* 7 Wn. (2d) 40, 108 P. (2d) 807. The interpretation of the statute defining injury in those cases was incorrect, and they should be overruled. The rule of interpretation now in effect aids an individual occasionally, but works to the disadvantage of the employers and employees alike. In such cases the employers are faced with the cost experience charge through no fault of their own and are therefore forced to hire only those men who are physically perfect. Their enforced action precludes the securing of jobs by a large body of men who have some physical disability. I can see no good reason for not overruling our recent cases. This court has corrected its decisions many times in the past and should make a correction at the present time.

The judgment of the trial court should be affirmed.